STATE of Wisconsin, Plaintiff-Appellant-Cross-Respondent,

v.

Matthew J. KNAPP, Defendant-Respondent-Cross-Appellant.

Supreme Court

*No. 00–2590–CR. Oral argument April 23, 2003.—Decided July 22, 2003.*

2003 WI 121

(Also reported in 666 N.W.2d 881.)

285

287

For the plaintiff-appellant-cross respondent the cause was argued by *William L. Gansner,* assistant attorney general, with whom on the briefs was *Peggy A. Lautenschlager,* attorney general.

For the defendant-respondent-cross appellant there were briefs by *Robert G. LeBell,* Milwaukee, and oral argument by *Robert G. LeBell.*

¶ 1. N. PATRICK CROOKS, J. This case comes to us upon certification from the court of appeals on the issue of whether physical evidence obtained as the direct result of a *Miranda*[1] violation should be suppressed when the violation was an intentional attempt to prevent the suspect from exercising his Fifth Amendment rights. Such review is necessary in light of the recent U.S. Supreme Court case of *Dickerson v. United States,* 530 U.S. 428 (2000). We also review additional issues, including whether the statements provided to the Department of Criminal Investigation (DCI) agents in violation of *Miranda* were involuntary; whether the physical evidence seized during the defendant's arrest should be suppressed as a violation of *Edwards v. Arizona,* 451 U.S. 477 (1981); whether the defendant's Fourth Amendment rights were violated when the detective entered the exterior doors of the apartment

---

[1] *Miranda v. Arizona,* 384 U.S. 436 (1966).

without knocking and announcing; whether the circuit court erred in suppressing evidence seized during the second warrantless search, with his brother's consent, of the defendant's bedroom; and whether the circuit court erred in admitting hearsay evidence implicating a third party in the murder.

¶ 2. First, with regard to the certified issue, based upon the holding of the U.S. Supreme Court in *Dickerson,* we reverse the decision of the circuit court which denied the motion to suppress evidence obtained as the direct result of a *Miranda* violation. We hold that *Dickerson* requires us to overrule the decision in *State v. Yang,* 2000 WI App. 63, 233 Wis. 2d 545, 608 N.W.2d 703, where, as here, the *Miranda* violation was intentional. The policy considerations related to deterrence and judicial integrity, which are the underpinnings of the exclusionary rule, support suppression of the physical evidence here.

¶ 3. In response to the second issue, we hold that Matthew J. Knapp (Knapp) provided statements to the DCI agents voluntarily, and that the circuit court correctly applied *Harris*[2] by admitting such statements solely for impeachment purposes during cross-examination.

¶ 4. Next, since we have determined that the motion to suppress the evidence (the sweatshirt) seized as a direct result of the intentional *Miranda* violation at the apartment should have been granted, there is no need to determine whether the alleged *Edwards*[3] violation should also result in suppression of the sweatshirt seized.

---

[2] *Harris v. New York,* 401 U.S. 222 (1971).

[3] *Edwards v. Arizona,* 451 U.S. 477 (1981).

¶ 5. Similarly, with regard to the fourth issue, since we have determined that the motion to suppress the sweatshirt seized as a direct result of the intentional *Miranda* violation at the apartment should have been granted, there is no need to determine whether the alleged Fourth Amendment violation, relating to a failure to knock and announce at the exterior doors prior to entering the premises, should also result in suppression of the sweatshirt seized.

¶ 6. Fifth, based upon the facts of this case, we hold that George Knapp (George), the defendant's brother, did not have actual or common authority to consent to a search of Knapp's bedroom, but that there was apparent authority. The circuit court was wrong when it held that physical evidence obtained during that second warrantless search should be suppressed.

¶ 7. Sixth, in light of *Denny*,[4] *Chambers*,[5] and the rules of evidence, we hold that the circuit court correctly determined that hearsay evidence, implicating a potential third party in the victim's murder, could be admitted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶ 8. The facts of this case are undisputed. Knapp's trial has been stayed pending the outcome of this appeal. The facts are drawn from the preliminary hearing, the motion hearings, and the allegations in the complaint and information.

¶ 9. Resa Scobie Brunner (Resa) was murdered in her home on December 12, 1987. At about 2 p.m. that day, her husband, Ervin J. Brunner (Brunner), found

[4] *State v. Denny,* 120 Wis. 2d 614, 625, 357 N.W.2d 12 (Ct. App. 1984).

[5] *Chambers v. Mississippi,* 410 U.S. 284 (1973).

Resa lying in their bedroom beaten to death by a baseball bat, and he called the Watertown Police. The autopsy established Resa's time of death as being between 2:15 and 4:30 a.m. Brunner claimed that he had been with another woman, Sharon Maas (Maas), all evening and had slept at his parents' house in Clyman that night. Brunner told police that he and Maas were in a bar in Sullivan until 2 a.m., and then they drove directly to his parents' house in Clyman without stopping in Watertown.

¶ 10.　At the time of the murder Maas was living at the home of Richard Borchardt, Sr. (Borchardt) in Watertown. Borchardt is now deceased and was never interviewed by police. Patricia Farrell, a friend of Borchardt's, told Watertown police during an August 4, 2000, interview that sometime after Resa's murder Borchardt told Farrell that on the night of the murder Maas arrived at the house very late and, after a short time inside the house, left with a brown paper bag. Borchardt told Farrell that he looked out the window and saw a truck he recognized as Brunner's sitting in the driveway with its lights turned off. Maas got into the truck and it backed out of the driveway and departed.

¶ 11.　Knapp was the last person seen with Resa that night. They were seen drinking together in a Watertown bar, and then eating together in a Watertown restaurant after the bar closed. Resa and Knapp got up to leave the restaurant at the same time, but Knapp left first, as Resa had to go back to pay her check. At the time of the murder Knapp was on parole. He was arrested on a parole violation on December 13, 1987, at the apartment he shared with his brother, George, and George's fiancée (now his wife), Helen.

¶ 12. Knapp resided with his brother and Helen in the second floor apartment of a house in Watertown. Access to the apartment was from doors on the ground floor, up a carpeted stairwell, to another door leading directly into the living room of the apartment. The door on the second floor contained a large window. The exterior doors consisted of a screen door and a wooden door. There was no working doorbell, and the exterior wooden door was not regularly locked.

¶ 13. On the day of Knapp's initial arrest, Detective Timothy Roets (Roets) of the Watertown Police Department entered the exterior doors of Knapp's apartment without knocking or announcing, and proceeded up the stairwell to the door at the top of the stairs. Roets saw Knapp through the door's window and told Knapp to open the door because he had a warrant for Knapp's arrest on a parole violation. Knapp picked up the phone to call his attorney. Knapp claims that Roets was banging on the door and ordering him to open up.[6] Regardless of whether Roets was banging or knocking, he asked Knapp to open the door. Knapp hung up the phone, stepped back, let Roets in, and told Roets he was trying to call his attorney. Roets informed Knapp that he had to go to the police station. Knapp and Roets went to Knapp's bedroom so Knapp could put on some shoes, and Roets asked Knapp what he had been wearing the prior evening. Knapp pointed to a pile of clothing on the floor. Roets seized the pile of clothing and transported Knapp to the police station. In that pile of clothing was a blue sweatshirt. A DNA test later

---

[6] The circuit court found this claim inconsistent with Roets' testimony and found Roets to be more credible. (Def. App. pp. 257–58). The circuit court found that it was more likely that Roets was nonaggressive and polite during his encounter with Knapp.

determined the sweatshirt contained Resa's blood on one sleeve. Roets did not give Knapp his *Miranda* warnings prior to asking him what he had been wearing, and Knapp did not say anything else about contacting his attorney at that time.

¶ 14. At the station Roets questioned Knapp further but still did not give him *Miranda* warnings. Knapp believed that he was assisting Roets as a witness, not as a suspect to Resa's murder. Knapp provided Roets with information about the prior evening, including the fact that he witnessed Resa fighting with another woman. Knapp stated that Resa got a bloody nose from the encounter and that he helped her wipe the blood on his sleeve. When it occurred to Knapp that he was not being questioned as a witness, but rather as a suspect, he asserted his right to counsel and stopped the questioning.

¶ 15. While Knapp was at the station Roets asked Knapp's brother, George, for consent to search the apartment. George was allowed to speak with Knapp and informed Knapp that he was consenting to a search of the apartment. Though Roets was not certain whether the consent form was signed before or after the conversation between George and Knapp, George testified that he talked to Knapp before signing the consent form. The consent George signed agreed to a search of the entire apartment, although the consent form did not specifically mention Knapp's bedroom.

¶ 16. There was testimony from both Knapp and George that Knapp was to pay George $150 in rent for the use of the bedroom. The record is unclear as to whether or not Knapp had actually paid George any money, as he had only been there a short time before the arrest. However, the circuit court determined that Knapp had paid rent. Testimony about Knapp's bed-

room revealed that Knapp was given a bedroom, which had a door and a lock, that he kept the door closed when he was not home, he had his own key to the apartment, and that George would not enter the bedroom without asking Knapp.

¶ 17. Resa's murder went unsolved and uncharged for twelve years. In addition to investigating Knapp's involvement, the police department interviewed and investigated others. Knapp asserts that a likely suspect of Resa's murder is her husband, Brunner. Prior to the murder Resa and Brunner told various witnesses that they were having marital problems. They had only been married for six months at the time. The night of Resa's murder, Brunner slept with Maas. The week before the murder Brunner found Resa sitting with another man in his truck, dragged Resa out of the truck, and told police officers he would "knock her out" if he ever caught Resa cheating on him again. Additionally, Brunner told his stepdaughter the night of the murder that he and Resa were fighting. Earlier that evening Resa called her daughter and told her to go to their home and take the key off of the porch. Brunner admitted he might not have had a key to his home that evening. During a fight with a girlfriend a few years later, Brunner stated that he wished he "had a bat." Brunner also stated previously during a polygraph examination that he killed his wife.

¶ 18. The DCI got involved in the case in 1998 and in the summer of 1999 located new witnesses who implicated Knapp in the murder. An ex-girlfriend of Knapp's, Sandra Huebner, stated that in 1995 Knapp beat her and said, "I'll do to you what I did to her." Pedro Blas-Jasso told an investigator that Knapp confessed to

him 10 to 15 times that he killed Resa. A criminal complaint was issued against Knapp on November 12, 1999.

A. Circuit Court

¶ 19. In Knapp's preliminary hearing on December 8, 1999, the circuit court found the evidence sufficient for a bindover. On February 14, 2000, Knapp filed motions for suppression of physical evidence seized during the search conducted at the time of his initial arrest on December 13, 1987, and the second search conducted with George's consent shortly after Knapp's arrest. Knapp also moved to suppress statements he made to the police without having received *Miranda* warnings. The circuit court, the Honorable Randy R. Koschnick presiding, conducted hearings on the suppression motions in May and June of 2000 and granted them in part and denied them in part in its July 22, 2000, and August 10, 2000, oral rulings. A written order was entered on September 19, 2000.

¶ 20. In its order the circuit court denied the motion to suppress items seized during the search conducted at the time of Knapp's arrest, granted the motion to suppress evidence seized during the second search, and granted the motion to suppress Knapp's statements during the State's case-in-chief, because of the violation of *Miranda,* but ruled that the statements could be used for impeachment purposes because they were voluntary.

¶ 21. On August 17, 2000, Knapp filed a motion to admit evidence of the guilt of other suspects. Knapp's offer of proof contained 45 items. The circuit court orally ruled on the motion to admit evidence in hearings on September 5, 2000, and September 8, 2000, and

granted the motion in part and denied it in part. The written order was entered on September 19, 2000.

B. Court of Appeals

¶ 22. The State filed a notice of appeal from the circuit court's order granting the motion to suppress physical evidence from the second search on September 21, 2000. Knapp filed a petition for leave to appeal the remainder of the suppression order. The State also filed a petition for leave to appeal the portion of the circuit court order admitting Item 21(a), which contained hearsay evidence allegedly undercutting Brunner's alibi on the night of the murder. The court of appeals granted the petitions on November 7, 2000. The court of appeals heard oral arguments on April 25, 2002, and on August 15, 2002, filed a certification in this court. Specifically, the court of appeals requested certification on the following issue: "Should physical evidence obtained as the direct result of a *Miranda* violation be suppressed when the violation was an intentional attempt to prevent the suspect from exercising his Fifth Amendment rights?" This court accepted the court of appeals' certification on September 26, 2002, and also accepted for review all issues raised in the parties' appeals before the court of appeals.

## II. ISSUES

¶ 23. In addition to the certified question, the following issues are presented: whether the statements provided to the DCI agents in violation of *Miranda* were involuntary.

¶ 24. Whether the physical evidence seized during the defendant's arrest should be suppressed as a violation of *Edwards*.

¶ 25. Whether the defendant's Fourth Amendment rights were violated when the detective entered the exterior doors of the apartment without knocking and announcing.

¶ 26. Whether the circuit court erred in suppressing evidence seized during the second warrantless search of the defendant's bedroom with George's consent.

¶ 27. Whether the circuit court erred in granting a motion to admit hearsay evidence implicating a third party in the murder.

## III. STANDARD OF REVIEW

¶ 28. Our analysis involves various issues that we decide under different standards of review. This court will uphold the circuit court's findings of fact on a motion to suppress unless they are against the great weight and clear preponderance of the evidence. "In reviewing an order suppressing evidence, appellate courts will uphold findings of evidentiary or historical fact unless they are clearly erroneous." *State v. Kieffer,* 217 Wis. 2d 531, 541, 577 N.W.2d 352 (1998). *See also State v. Harris,* 206 Wis. 2d 243, 249–50, 557 N.W.2d 245 (1996), and Wis. Stat. § 805.17(2) (2001–2002).[7] However, whether those facts satisfy the constitutional requirement of reasonableness is a question of law which this court reviews de novo. *State v. Waldner,* 206 Wis. 2d 51, 54, 556 N.W.2d 681 (1996). The reasonableness of a search is a constitutional question, which we review independently, but with the benefit of the analysis of the circuit court. *Kieffer,* 217 Wis. 2d at 541.

---

[7] All subsequent references to the Wisconsin Statutes are to the 2001–02 version unless otherwise indicated.

█

¶ 29. With regard to evidentiary questions, which are subject to the circuit court's discretion, they are usually reviewed by appellate courts on the basis of whether there was an erroneous exercise of discretion. *State v. Pharr,* 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983). However, when, as in this case, the focus of a circuit court's ruling is on a defendant's asserted due process right to introduce evidence, the issue is more properly characterized as one of constitutional fact, and is, therefore, subject to de novo review. *See State v. Stutesman,* 221 Wis. 2d 178, 182, 585 N.W.2d 181 (Ct. App. 1998) ("[W]hether a trial court's ruling excluding evidence deprived a defendant of the constitutional right to present evidence is a question of 'constitutional fact,' which we review de novo."). *See also State v. St. George,* 2002 WI 50, ¶¶ 48–49, 252 Wis. 2d 499, 643 N.W.2d 777 (supreme court must determine as a matter of law whether defendant was denied his constitutional right to present a defense when circuit court excluded expert testimony).

### IV. CERTIFIED ISSUE—SUPPRESSION OF PHYSICAL EVIDENCE

¶ 30. As noted, the court of appeals certified the question: Should physical evidence obtained as the direct result of a *Miranda* violation be suppressed when the violation was an intentional attempt to prevent the suspect from exercising his Fifth Amendment rights?[8]

---

[8] The Fifth Amendment to the United States Constitution provides, "No person . . . shall be compelled in any criminal case to be a witness against himself." The Fifth Amendment is applied to the states by the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 2–3 n.1 (1964).

¶ 31. The State concedes that at the time Knapp identified the physical evidence, *i.e.* his sweatshirt, he was in custody and being interrogated by police. Further, the State does not dispute that Knapp's pointing to the sweatshirt was testimonial in nature. Consequently, the State does not challenge either the circuit court's conclusion that the police violated Knapp's *Miranda* rights or its subsequent decision to suppress in the State's case-in-chief all of the statements the police obtained in violation of *Miranda*.

¶ 32. However, Knapp asks this court to reverse the circuit court's ruling and hold that the physical evidence in this case, his sweatshirt, should be suppressed as well because the clothing was identified by Knapp in response to questions put to him without being advised of, and then waiving his rights, as required by *Miranda*. The clothing obtained, he argues, was the inadmissible fruit of the *Miranda* violation.

¶ 33. Moreover, Knapp argues that the circuit court wrongly relied on *Yang* to hold that physical evidence discovered as a direct result of a statement obtained in violation of *Miranda* is still admissible despite the "fruit of the poisonous tree" doctrine. *Yang,* 233 Wis. 2d 545, ¶ 14. Knapp points out that *Yang* relied upon the *Elstad-Tucker*[9] rule for its reasoning. The decisions in *Elstad* and *Tucker* rest on the premise that a *Miranda* violation is not a constitutional violation, and that *Miranda* was not a constitutional imperative, but a mere "prophylactic standard."

¶ 34. Knapp argues that the premise underlying *Elstad, Tucker,* and *Yang* has arguably been disavowed by the U.S. Supreme Court decision in *Dickerson,* 530

---

[9] *Oregon v. Elstad,* 470 U.S. 298 (1985), and *Michigan v. Tucker,* 417 U.S. 433 (1974).

U.S. 428, which upheld the viability of *Miranda* as a decision that "announced a constitutional rule."

¶ 35. Accordingly, Knapp maintains that *Yang* is no longer good law, because *Miranda* is a constitutional rule, and physical evidence obtained in violation of that rule is inadmissible under the fruit of the poisonous tree doctrine.

¶ 36. Knapp also maintains that appellate court decisions, in light of *Dickerson,* have been mixed. As a result, Knapp argues that this court must look at the mindset of the questioning officer in failing to *Mirandize* Knapp.

¶ 37. Knapp argues that the rationale of *Yang* depends upon the premise that a *Miranda* violation is a mere error—the type of mistake that is unavoidable in regular police work. Knapp maintains that this premise does not work in this case because: (1) Roets knew of the requirement to *Mirandize* suspects in custody (R. 102:79–80; Def. App. 362–63); and (2) Roets knew that Knapp was unlikely to respond to questions if he was advised of his rights (R. 102:120, 123–24; Def. App. 377, 379–80). Therefore, Knapp argues, this was no benign error, as Roets deliberately chose to disregard *Miranda.*

¶ 38. The State disagrees with Knapp and asks that this court uphold the circuit court's ruling that the physical evidence is admissible.

¶ 39. As noted, the State concedes that Roets violated the requirements of *Miranda* when, without advice and waiver of rights, he asked Knapp what clothing he had been wearing the evening of December 11 and early morning of December 12. As a result, the State agrees that Knapp's statements in response to that question should not be admissible in the State's

case-in-chief. The State nevertheless argues that Knapp's clothing is not subject to suppression for the *Miranda* violation.

¶ 40. The State argues that *Yang* stands for the proposition that if the non-*Mirandized* statement was voluntary, "the fruit of the poisonous tree doctrine does not apply" because the statement was not unconstitutionally obtained. *Yang*, 233 Wis. 2d, ¶ 3. If the "statements leading the police to the physical evidence were voluntary, that evidence is admissible." *Id.* In support of its argument the State contends that the *Yang* holding is supported by *Elstad* and *Tucker.*

¶ 41. The State argues that *Dickerson* does not abrogate the holding in *Yang* because it did not overrule *Tucker* or *Elstad.*

¶ 42. In support of its argument the State points out that other courts have applied the *Elstad-Tucker* rule after *Dickerson*. The State cites the Third Circuit case of *United States v. DeSumma,* 272 F.3d 176 (3d Cir. 2001),[10] and the Fourth Circuit's decision in *United States v. Sterling,* 283 F.3d 216 (4th Cir. 2002).[11]

---

[10] The Third Circuit concluded that *Dickerson* had not abrogated or overruled *Elstad's* principle that the fruit of the poisonous tree doctrine did not extend to violations of *Miranda*. *United States v. DeSumma,* 272 F.3d 176, 180–181 (3d Cir. 2001).

[11] The Fourth Circuit concluded that *Dickerson* did not provide a persuasive basis for overruling its prior decision in *United States v. Elie,* 111 F.3d 1135 (4th Cir. 1997), which had declined to extend the fruit of the poisonous tree doctrine to statements obtained in violation of *Miranda*. *United States v. Sterling,* 283 F.3d 216, 218–19 (4th Cir. 2002).

## V. ANALYSIS OF CERTIFIED ISSUE

¶ 43. The certified issue requires this court to determine to what extent, if any, the *Dickerson* decision undermines *Yang*.

¶ 44. The scope of protection afforded to citizens under the Fifth Amendment right against compulsory self-incrimination has received considerable attention in the opinions of the U.S. Supreme Court, and in this court as well. *See Oregon v. Elstad,* 470 U.S. 298 (1985); *Michigan v. Tucker,* 417 U.S. 433 (1974). *See also Dickerson,* 530 U.S. 428; *Kastigar v. United States,* 406 U.S. 441, 460–61 (1972); *Miranda v. Arizona,* 384 U.S. 436 (1966); *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 79 (1964); *Yang,* 233 Wis. 2d 545, *review denied* 2000 WI 121, 239 Wis. 2d 310, 619 N.W.2d 92.

¶ 45. The Fifth Amendment to the U.S. Constitution provides, "No person . . . shall be compelled in any criminal case to be a witness against himself." The Fifth Amendment is applicable here through the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 2–3 n.1 (1964). The protection from compulsory self-incrimination has been referred to as "the mainstay of our adversary system of criminal justice," *Tucker,* 417 U.S. 433 (quoting *Johnson v. New Jersey,* 384 U.S. 719 (1966)), and as "one of the great landmarks in man's struggle to make himself civilized." *Id.* (quoting *Ullmann v. United States,* 350 U.S. 422 (1956)). Moreover, the privilege against self-incrimination "was aimed at a . . . far-reaching evil—a reoccurrence of the Inquisition and the Star Chamber, even if not in their stark brutality." Ullmann at 428. Wisconsin, in full accord with the well-founded Fifth Amendment jurisprudence, has also extended protection from self-incrimination in

a criminal case to its citizens through Article I, Section 7, of the Wisconsin Constitution.[12]

## A. *Miranda v. Arizona*

¶ 46. In 1966 the U.S. Supreme Court in a landmark decision, *Miranda v. Arizona,* expanded restrictions on police interrogation practices. In protecting one's Fifth Amendment right against self-incrimination, the Supreme Court established a set of procedural safeguards. According to *Miranda,* the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates compliance with *Miranda* dictates. *Miranda,* 384 U.S. at 444.[13] If police fail to read the warnings, the suspect's statements in response to questioning are presumed to be coerced, and the prosecution is prohibited from using the statements at trial in its case-in-chief. *See Harris v. New York,* 401 U.S. 222 (1971).

---

[12] Wisconsin Const. art. I, § 7 states:

In all criminal prosecutions the accused shall enjoy the right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face; to have compulsory process to compel the attendance of witnesses in his behalf; and in prosecutions by indictment, or information, to a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed; which county or district shall have been previously ascertained by law.

[13] According to *Miranda,* police are required to warn a suspect in custody, prior to any questioning, that he has the right to remain silent; that anything he says can be used as evidence against him; that he has the right to the presence of an attorney during interrogation; and that if he cannot afford a lawyer, one will be appointed.

██

¶ 47. Under *Miranda,* "[c]ustodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444.

B. *Miranda* Violations and the Poisonous Tree Doctrine

██

. ¶ 48. In *Wong Sun v. United States,* 371 U.S. 471 (1963), the Supreme Court articulated the "fruit of the poisonous tree" doctrine. According to the *Wong Sun* majority, derivative evidence, such as physical evidence, is not the "fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police." *Id.* at 488. Rather, derivative evidence must be suppressed as "fruit of the poisonous tree," if it was discovered by exploiting an illegal search. *Id.* Consequently, if the derivative evidence is discovered "by means sufficiently distinguishable [from the illegality] to be purged of the primary taint," then it is admissible. *Id.*

¶ 49. Since 1966 on two occasions the U.S. Supreme Court has considered whether derivative evidence obtained in violation of *Miranda* should be suppressed. Those two cases are pivotal to our analysis.

¶ 50. First, in *Tucker,* the Supreme Court was asked to apply the *Wong Sun* "tainted fruits" doctrine to the testimony of a witness whose identity was discovered as the result of a statement obtained in violation of *Miranda. Tucker* involved an un-*Mirandized* custodial interrogation that occurred prior to the issuance of the *Miranda* decision. During the course of the interrogation the defendant identified a relevant witness of

whom the police previously had been ignorant. The defendant argued before the Court that the testimony of the witness so identified by the defendant should have been barred as the fruit of the *Miranda* violation. The Court's rejection of this argument rested largely on its conclusion that excluding the fruits of this confession would have minimal prophylactic effect because the officers were acting in complete good faith under prevailing pre-*Miranda* law that barred only coerced confessions. The *Tucker* court explained:

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. . . . Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.
>
> We consider it significant to our decision in this case that the officers' failure to advise the respondent of his right to appointed counsel occurred prior to the decision in *Miranda*. Although we have been urged to resolve the broad question of whether evidence derived from statements taken in violation of the *Miranda* rules must be excluded regardless of when the interrogation took place, we instead place our holding on a narrower ground.

*Tucker,* 417 U.S. at 447.

¶ 51. Second, in *Elstad* the U.S. Supreme Court was faced with the issue of whether a defendant's post-*Mirandized* statements must be suppressed as the fruit of the earlier *Miranda* violation. *Elstad,* 470 U.S. at 303. In that case, the defendant made incriminating statements while in custodial interrogation prior to the *Miranda* warnings. The police then administered *Miranda* warnings, and, thereafter, the defendant made

305

further incriminating statements. The *Elstad* court held that suppression was not required, rejecting the view that the post-warning statements were the unconstitutional product of "a subtle form of lingering compulsion, the psychological impact of the suspect's conviction that he has let the cat out of the bag. . . . " *Id.* at 311.

## C. Wisconsin Law and the *Yang* Decision

¶ 52. Relying on *Tucker* and *Elstad,* the Wisconsin court of appeals in *Yang,* 233 Wis. 2d 545, ¶ 3, held that the officer's failure to administer the *Miranda* warnings prior to Yang's oral statements was not a constitutional infringement. The court of appeals said:

> The *Tucker* and *Elstad* holdings could not be clearer: the "poisonous tree" in *Wong Sun* is a constitutional violation and, absent such a violation, there is no tainted fruit. It is well established that the failure to deliver *Miranda* warnings is not itself a constitutional violation. (Citing *Elstad*). Accordingly, derivative physical evidence obtained as a result of an unwarned statement that was voluntary under the Fifth Amendment is not "tainted fruit."

*Yang,* 233 Wis. 2d 545, ¶ 36.

¶ 53. Moreover, the court of appeals in *Yang* said:

> Policemen investigating serious crimes [cannot realistically be expected to] make no errors whatsoever. If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself.

*Yang,* 233 Wis. 2d 545, ¶ 37 (citing *Elstad,* 470 U.S. at 308–309).

## D. *Dickerson*

¶ 54. Several months after *Yang* was decided, the U.S. Supreme Court held in *Dickerson* that *Miranda* was a "constitutional decision," and that it created a "constitutional rule," and therefore, Congress could not legislatively overrule *Miranda*. *Dickerson,* 530 U.S at 441.

¶ 55. Consequently, we are faced with the question of whether the Supreme Court decision in *Dickerson* completely undermined the *Yang* decision.

¶ 56. Lower courts applying *Dickerson* have split on the proper application of *Wong Sun* to the physical fruits resulting from a *Miranda* violation. For example, the Third and Fourth Circuits have ruled that the physical fruits of a *Miranda* violation never are subject to *Wong Sun* suppression. In *DeSumma,* 272 F.3d at 179–81, *cert denied,* 122 S.Ct. 1631 (2002), the U.S. Court of Appeals for the Third Circuit upheld the admission of a gun found as a result of a voluntary statement made by the defendant before he was given *Miranda* warnings. The court held that "the fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before *Miranda* warnings are issued." *Id.* at 180. Based on *Dickerson's* discussion of *Elstad,* the Third Circuit concluded that *Dickerson* "continued to observe the distinction between *Miranda's* application to cases involving the Fifth, rather than the Fourth, Amendment." *Id.* at 179.

¶ 57. Similarly, in *United States v. Sterling,* 283 F.3d 216, 218–19 (4th Cir. 2002), *cert. denied,* 122 S.Ct. 2606 (2002), the U.S. Court of Appeals for the Fourth Circuit upheld the admission of a gun found as a result of a voluntary statement made by the defendant before

he was given *Miranda* warnings. The Fourth Circuit relied on its prior decision in *United States v. Elie,* 111 F.3d 1135, 1142 (4th Cir. 1997), which held that "derivative evidence obtained as a result of an unwarned statement that was voluntary under the Fifth Amendment is never 'fruit of the poisonous tree.' " The Fourth Circuit concluded in *Sterling* that "the distinction [drawn in *Tucker* and *Elstad*] between statements and derivative evidence survives *Dickerson,*" *Sterling,* 283 F.3d at 219, and that "*Dickerson* does not overrule *Tucker* or *Elstad,* and our holding in *Elie,* based on those two cases, survives." *Id.*

¶ 58. In contrast to the Third and Fourth Circuits, the U.S. Court of Appeals for the First Circuit has ruled that the physical fruits of a *Miranda* violation must be suppressed in certain circumstances, depending on the need for deterrence of police misconduct, in light of the circumstances of each case. *United States v. Faulkingham,* 295 F.3d 85 (1st Cir. 2002). In *Faulkingham,* the First Circuit used a case-by-case approach that requires the suppression of derivative evidence only when the need for deterrence outweighs the reliability of the evidence in a particular case. *Faulkingham* upheld the admission of drugs and the testimony of a witness discovered as a result of voluntary statements made by the defendant who was not given *Miranda* warnings. The First Circuit recognized that "[t]he various differences in purpose behind the Fourth and Fifth amendments, articulated in *Elstad,* continue unchanged by *Dickerson,* and those differences affect the remedial options appropriate for violations of the two distinct constitutional amendments, and more specifically, for violations of the *Miranda* rule." *Id.* at 93. *Faulkingham* acknowledged, contrary to *Sterling* and *DeSumma,* that *Dickerson's* recognition that *Miranda*

violations are constitutional violations strengthened the argument that the physical fruits resulting from a *Miranda* violation must be suppressed. *Id.* at 93.

¶ 59. The *Faulkingham* court noted that: "[un-]like some other circuits, we are unwilling, at least until the Supreme Court addresses the issue, to say that the interest of deterrence may never lead to the suppression of derivative evidence from a *Miranda* violation." *Id.*

¶ 60. In a similar vein, the U.S. Court of Appeals for the Tenth Circuit, in *United States v. Patane,* 304 F.3d 1013 (10th Cir. 2002), *cert. granted,* 123 S.Ct. 1788 (2003), affirmed the district court's order that the evidence in that case must be suppressed as the physical fruit of a *Miranda* violation. The suspect in *Patane* was arrested for violating a domestic violence restraining order. The suspect himself cut off the officer's attempt to advise him of his *Miranda* rights, saying that he already knew his rights.

¶ 61. In recognizing the split of authority in applying *Wong Sun* after *Dickerson,* the *Patane* court disagreed with the Third and Fourth Circuit Courts in *Sterling* and *DeSumma* and said:

> We conclude that the First Circuit is correct that the physical fruits of a violation must be suppressed where necessary to serve *Miranda*'s deterrent purpose. However, we part company with the first circuit in the application of that standard, because we conclude that *Miranda*'s deterrent purpose requires suppression of the physical fruits of a negligent *Miranda* violation. We therefore conclude that suppression of the gun in the present case was appropriate.

*Patane,* 304 F.3d at 1023, *cert. granted,* 123 S.Ct. 1788 (2003).

¶ 62. As noted above, the *Patane* court distinguished the First Circuit's decision in *Faulkingham*. *Patane* disagreed with *Faulkingham's* conclusion that suppression of the fruits of a *Miranda* violation is not required in every case. The court in *Patane* stated:

> We do not believe that "the role of deterrence . . . becomes less primary" once the statement itself has been suppressed. Instead, the relevant question remains whether suppression of the statement alone provides deterrence sufficient to protect citizens' constitutional privilege against self-incrimination.

*Patane,* 304 F.3d at 1028.

¶ 63. As noted previously, Wisconsin has also provided protection from self-incrimination in a criminal case to its citizens through Article I, Section 7, of the Wisconsin Constitution.

¶ 64. Turning to the issue of *Dickerson's* impact on *Yang,* we note that here the circuit court relied on *Yang* to hold that the physical evidence (the sweatshirt) discovered at Knapp's residence as a direct result of a statement obtained in violation of *Miranda* was admissible.

¶ 65. However, as discussed previously, *Yang* relied upon the *Elstad-Tucker* rule to justify its conclusion that the "fruits of the poisonous tree" doctrine did not apply to physical evidence derived directly from statements given in violation of *Miranda. See Elstad,* 470 U.S. 298; *Tucker,* 417 U.S. 433.

¶ 66. Both *Tucker* and *Elstad* were predicated upon the premise that the *Miranda* rule was a prophylactic rule, rather than a constitutional one. *Elstad,* 470 U.S. at 305 ("'The prophylactic *Miranda* warnings therefore are not themselves rights protected by the Constitution . . . .'" (quoting *New York v. Quarles,* 467 U.S. 649,

654 (1984)); *see also id.* at 308 ("Since there was no actual infringement of the suspect's constitutional rights, [*Tucker*] was not controlled by the doctrine in *Wong Sun* that fruits of a constitutional violation must be suppressed.").

¶ 67. As discussed previously, the foundation upon which *Tucker* and *Elstad* were based has been fundamentally altered by *Dickerson*. *Dickerson* declared, unequivocally, that *Miranda* expressed a constitutional rule, rather than a mere prophylactic protection. *Dickerson,* 530 U.S. at 444.

¶ 68. We agree with the *Patane* court that *Sterling* and *DeSumma* focused on an isolated passage in *Dickerson*. *Dickerson* noted at the outset of the opinion that "*Miranda* and its progeny in this Court govern the admissibility of statements made during custodial interrogation in both state and federal courts." *Dickerson,* 530 U.S. at 432. Later in the opinion, in the course of rejecting various arguments supporting the erroneous view that *Miranda* was not a constitutional decision, the *Dickerson* court made a distinction between Fourth and Fifth Amendment violations. *Dickerson,* 530 U.S. at 438–41. The *Sterling* court interpreted the distinction to mean that statements and derivative evidence survive *Dickerson.*

¶ 69. The *Patane* court recognized "two serious problems with the reasoning in *DeSumma* and *Sterling.*" *Patane,* 304 F.3d at 1024. First, the court in *Patane* noted that neither *Elstad* nor *Tucker* involved the physical fruits of a *Miranda* violation. *Elstad* expressly contrasted the subsequent confession it found admissible from the physical fruits, while *Tucker* expressly limited its holding to pre-*Miranda* interrogations. Accordingly, the court in *Patane* recognized that *Dickerson* "effectively left *Elstad* and *Tucker* standing

311

but prevented lower courts from extending their holdings." *Id.* at 1025. As such, *Dickerson* broke away from pre-*Dickerson* lower court case law.

¶ 70. The *Patane* court noted that *DeSumma* and *Sterling* improperly relied on the language in *Dickerson* that distinguishes Fourth and Fifth Amendment violations. The court in *Patane* stated that the two violations are different because of the narrowed application of the fruits of the poisonous tree doctrine applied to *Miranda* violations. *Patane,* 304 F.3d at 1023–24. However, the *Dickerson* Court did not say that the doctrine did not apply at all.[14]

¶ 71. In pointing out the analytical flaws in *DeSumma* and *Sterling,* the *Patane* court concluded that: "[a] blanket rule barring application of the fruits doctrine to the physical fruits of a *Miranda* violation would mark a dramatic departure from Supreme Court precedent." *Patane,* 304 F.3d at 1026 (citing *Nix v. Williams,* 467 U.S. 431, 442–43 (1984)).

¶ 72. In addition to the holding in *Dickerson* that *Miranda* violations are indeed constitutional violations, there are important policy considerations underpinning the logic of the exclusionary rule.

■

¶ 73. Here, it is undisputed that Roets intentionally violated Knapp's *Miranda* rights in order to procure derivative/physical evidence. As stated in the State's brief:

The State conceded below (52:1) that Detective Roets violated the requirements of *Miranda* when, without

---

[14] The following cases have held that the fruits of the poisonous tree doctrine applied with respect to Fifth Amendment violations. *See, e.g., Nix v. Williams,* 467 U.S. 431, 442 (1984), and *Kastigar v. United States,* 406 U.S. 441, 453 (1972).

312

> an advisement and waiver of *Miranda* rights, he asked
> Matthew Knapp in his bedroom on December 13, 1987,
> what clothing he had been wearing on the evening of
> December 11 and the early morning of December 12.

Appellant-Cross-Resp't Br. at 10. If we do not suppress
physical evidence in situations of intentional violations
of *Miranda,* we, in essence, undermine the deterrent
effect upon which such a decision was based.

¶ 74. The rule argued for by the State would
minimize the seriousness of the police misconduct pro-
ducing the evidentiary fruits, breed contempt for the
law, and encourage the type of conduct that *Miranda*
was designed to prevent, especially where the police
conduct is intentional, as it was here. *See Patane,* 304
F.3d at 1026 (citing Yale Kamisar, *On the "Fruits" of
Miranda Violations, Coerced Confessions, and Com-
pelled Testimony,* 93 Mich. L. Rev. 929, 933 (1995)
("Unless the courts bar the use of the often valuable
evidence derived from an inadmissible confession, as
well as the confession itself, there will remain a strong
incentive to resort to forbidden interrogation meth-
ods."); David A. Wollin, *Policing the Police: Should
Miranda Violations Bear Fruit?,* 53 Ohio St. L. J. 805,
843–48 (1992) ("Police officers seeking physical evi-
dence are not likely to view the loss of unwarned
confession as particularly great when weighed against
the opportunity to recover highly probative nontestimo-
nial evidence such as a murder weapon or narcotics.")).
As author Robert M. Pitler notes:

> [I]t is clear that if the police were permitted to utilize
> illegally obtained confessions for links and leads rather
> than being required to gather evidence independently,
> then *Miranda* warnings would be of no value in pro-
> tecting the privilege against self-incrimination. The
> requirement of a warning would be meaningless, for

the police would be permitted to accomplish indirectly what they could not accomplish directly, and there would exist no incentive to warn.

Robert M. Pitler, *The Fruit of the Poisonous Tree, Revisited and Shepardized,* 56 Cal.L.Rev. 579, 620 (1968).

¶ 75. *Tucker* and *Elstad* recognized the important policy considerations underpinning *Miranda* and *Wong Sun. Elstad,* 470 U.S. at 308 (identifying trustworthiness and deterrence as the two rationales for a broad fruits suppression rule). *Tucker,* 417 U.S. at 447–49.

¶ 76. The *Patane* court stated that Supreme Court precedent "consistently has recognized that deterrence of police misconduct, whether deliberate or negligent, is the fundamental justification for the fruits doctrine." *Patane,* 304 F.3d at 1026 (citing *Nix,* 467 U.S. at 442–43) ("The core rationale consistently advanced by this Court for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections.").[15]

¶ 77. In *State v. Ward,* 2000 WI 3, ¶ 46–47, 231 Wis. 2d 723, 604 N.W.2d 517, we discussed the importance of the deterrent effect of the exclusionary rule. Moreover, we recognized that the exclusionary rule not

---

[15] We agree with the court in *Patane* that "[b]ecause the physical fruits of a *Miranda* violation will be trustworthy evidence, it appears that in most cases the . . . analysis boils down to a rule excluding the fruits of a *Miranda* violation only when there is a 'strong need for deterrence.' ". *United States v. Patane,* 304 F.3d 1013, 1029 (10th Cir. 2002).

only acts as a deterrent tool in preventing police misconduct, but also acts to preserve judicial integrity. As we noted:

> Although this remedial principle appears to be the sole pillar supporting the Supreme Court's contemporary rationale for application of the exclusionary rule a second principle, judicial integrity, has been cited in the Court's exclusionary rule jurisprudence:

> It was of this [judicial integrity] that Mr. Justice Holmes and Mr. Justice Brandeis so eloquently spoke in *Olmstead v. United States* . . . . "For those who agree with me," said Mr. Justice Holmes, "no distinction can be taken between the Government as prosecutor and the Government as judge." . . . "In a government of laws," said Mr. Justice Brandeis, "existence of the government will be imperiled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for the law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face."

*Ward,* 231 Wis. 2d 723, ¶ 47 (citations and quotations omitted).

¶ 78. Based on the reasons set forth above, we reverse the order of the circuit court denying the motion to suppress evidence obtained as the direct result of a *Miranda* violation arising from the search conducted at the time of Knapp's arrest.

¶ 79. We accept much of the reasoning in *Faulkingham* and in *Patane,* and as such, hold that *Dickerson* requires us to overrule *Yang* where the violation of *Miranda* was intentional. We hold that the policy considerations related to deterrent effect and judicial integrity, which are the underpinnings of the exclusionary rule, support the suppression of physical evidence in situations where there was an intentional *Miranda* violation. We do not have to, and do not, decide whether a negligent *Miranda* violation would result in the same holding.

## VI. ISSUE TWO—VOLUNTARY STATEMENTS

¶ 80. Knapp contends that the circuit court correctly ruled that the statements taken from Knapp by the DCI agents were inadmissible in the State's case-in-chief. However, Knapp argues that the circuit court erred in finding that his statements were "voluntary." Accordingly, Knapp asks this court to hold that all statements given to DCI agents during his interview are inadmissible for any purpose.

¶ 81. Knapp maintains that the statements taken from him by DCI agents should be inadmissible for any purpose because they were taken in violation of *Miranda,* and were the involuntary product of police coercion. Knapp states that the DCI agents planned a "ruse" to induce Knapp to give a statement. (R. 103:52; Def. App. 387.) The plan was to tell Knapp that they were there to investigate constitutional violations by members of the Watertown Police Department, including Roets. (R. 103:53, 67; Def. App. 388–89.) The ruse was necessary, according to Knapp, because DCI agents believed that Knapp would not talk otherwise. (R. 103:53, 123, 125, 146; Def. App. 388–89, 397, 401, 405).

¶ 82. Knapp points out that the circuit court found as a matter of fact that:

> If the defendant had been read his *Miranda* rights, he most likely would not have spoken. If the defendant had not been deceived as to the nature and scope of the interview, he almost definitely would not have spoken.
>
> There is no question in the Court's mind that but for the deception and failure to follow *Miranda,* the defendant would not have made a statement to DCI agents on November 10th, 1998.

(R. 108:11; Def. App. 285).

¶ 83. Knapp states that awareness of the adversarial nature of the encounter is an important component of voluntariness.[16] Knapp contends that once it became clear to him as to why he was being questioned, he walked out of the interview and invoked his right to counsel. (R. 103:74–75, R. 107; Def. App. 391–92, 397; R. 104:28; Def. App. 420).

¶ 84. Knapp argues that the DCI agents went out of their way to be friendly to him and to portray themselves as his allies. Following *Frazier v. Cupp,* 394 U.S. 731, 739 (1969), Knapp argues that the deception

---

[16] Knapp cites *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961), for the test in determining "voluntary" statements:

> [T]he ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

coupled with a *Miranda* violation overcame Knapp's free will, when reviewed in the light of the totality of the circumstances.[17]

¶ 85. Knapp argues that the circuit court erroneously relied upon *State v. Albrecht,* 184 Wis. 2d 287, 516 N.W.2d 776 (Ct. App. 1994) in finding that the DCI interview was voluntary. In support of his position, Knapp cites *United States v. Walton,* 10 F.3d 1024 (3d Cir. 1993),[18] and *United States v. Veilleux,* 846 F. Supp. 149 (D. N.H. 1994).[19]

¶ 86. Knapp argues that the exclusionary rule in *Dickerson* precludes any use of statements made to DCI agents. Knapp argues that the logic of *Patane* and *Kruger*[20] apply to the facts of this case. He further maintains that the conduct of the officers was so egregious that the fruits of their inappropriate efforts should be excluded for any evidentiary purpose.

¶ 87. The State disagrees with Knapp and asks this court to uphold the ruling of the circuit court that the statements given to DCI agents during a prison

---

[17] *Frazier v. Cupp,* 394 U.S. 731, 739 (1969) (holding that while deception alone does not necessitate a finding of involuntariness, it must be considered along with other factors in light of the totality of the circumstances).

[18] In *Walton,* the court held that in light of the totality of the circumstances, and that the defendant there was not advised that he was the suspect in the crime, the confession was not voluntary. *United States v. Walton,* 10 F.3d at 1024, 1030 (3d Cir. 1993).

[19] In *Veilleux* the court found that the detective misled the defendant and concluded that his statements were involuntary and inadmissible. *United States v. Veilleux,* 846 F. Supp. 149 (D. N.H. 1994).

[20] *United States v. Kruger,* 151 F. Supp. 2d 86 (D.C. Me. 2001).

318

interview in 1998 were voluntarily given and were not the result of coercive or improper police conduct. The State argues that the statements should be available to the State at trial for impeachment purposes.

¶ 88. The State concedes that the statements were obtained during prison interrogation, not preceded by advice concerning and waiver of *Miranda* rights. However, the State claims that while Knapp's statements are not admissible in the State's case-in-chief, they can be used for impeachment purposes.

¶ 89. The State contends that this is a pure legal question, and must be decided under a well-established legal standard set forth in *State v. Clappes,* 136 Wis. 2d 222, 235–36, 401 N.W.2d 759 (1987). *Clappes* held that:

> In determining whether a confession was voluntarily made, the essential inquiry is whether the confession was procured via coercive means or whether it was the product of improper pressures exercised by the police . . . . The presence or absence of actual coercion or improper police practices is the focus of the inquiry because it is determinative on the issue of whether the inculpatory statement was the product of a "free and unconstrained will, reflecting deliberateness of choice."

*Clappes,* 136 Wis. 2d at 235–36 (internal citations omitted).

¶ 90. The State concedes that there is no doubt that police employed intentional deception and trickery. However, the State argues that police deception, without more, does not render a suspect's statement involuntary. *See, e.g., Albrecht,* 184 Wis. 2d 287. The State argues that Knapp's free will was manifested when, after figuring out the ruse, he cut off the interview and departed the room—with no interference of any kind from the officers (R. 108:16). Accordingly, though de-

319

ception and trickery were present, the State claims that there was no improper or coercive means employed at any time.

¶ 91. In response to the State's argument that deception alone does not render a confession involuntary, Knapp argues that in this case there was more than just police deception. Knapp argues that the agents made a calculated decision not to *Mirandize* Knapp because they feared he might exercise his rights. The intentional failure to read the *Miranda* warnings, Knapp argues, rendered the deception coercive because it "affirmatively misled [Knapp] about the scope of his constitutional protection against self-incrimination." *Veilleux,* 846 F. Supp. 149.

¶ 92. Although the State urges this court to follow *DeSumma* and *Sterling,* which held that *Dickerson* did not extend the fruit of the poisonous tree doctrine to derivative evidence, Knapp contends that *DeSumma* and *Sterling* erroneously reached the conclusion that *Dickerson's* reference to the controlling force of "*Miranda* and its progeny in this Court" foreclosed the argument that fruits of a *Miranda* violation may be suppressed. Furthermore, Knapp argues that *DeSumma* and *Sterling* erroneously relied upon the proposition that *Dickerson* endorsed the extension of the *Elstad-Tucker* rule.

¶ 93. Knapp maintains that *Patane* carefully analyzes the holding in *Dickerson* and concludes that the exclusionary rule does apply to derivative evidence, including statements.

## VII. ANALYSIS OF ISSUE TWO

¶ 94. As stated earlier, this court will uphold the circuit court's findings of evidentiary or historical facts unless they are contrary to the great weight and clear

preponderance of the evidence. *Clappes,* 136 Wis. 2d at 235. Accordingly, we agree with the circuit court's ruling, based upon the proper application of *Albrecht,* 184 Wis. 2d 287, that Knapp's statements to DCI agents on November 10, 1998, were voluntary and not the result of any coercive or improper police conduct.

¶ 95. In essence, this court is presented with the question of whether a custodial inculpatory statement, obtained without proper *Miranda* warnings, and extracted through the use of police deception, is an "involuntary" self-incriminatory statement and inadmissible at trial for any purpose.

¶ 96. Custodial police interrogation, by its nature, exerts pressure upon the accused, and "[e]ven without employing brutality, the 'third degree' or [other] specific stratagems . . . custodial interrogation exacts a heavy toll on individual liberty and trades on the weaknesses of individuals." *Miranda,* 384 U.S. at 455.

> [T]he coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be "accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself."

*Dickerson,* 530 U.S. at 435.

¶ 97. Where a defendant claims that his admissions were compelled, the government bears the burden of proving voluntariness by a preponderance of the evidence. *United States v. Jackson,* 918 F.2d 236, 241 (1st Cir. 1990). An involuntary confession may result from psychological or physical coercion. *See, e.g. Miller v. Fenton,* 796 F.2d 598, 603–04 (3d Cir. 1986), *cert. denied,* 479 U.S. 989 (1986).

¶ 98. Dating back to 1897, in *Bram v. United States,* 168 U.S. 532 (1897), the U.S. Supreme Court stated that a voluntary confession must not have been "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, not by the exertion of any improper influence . . . ." *Id.* at 542–43. However, the holding in *Bram* has not been strictly interpreted as a per se ban against every promise made during custodial interrogations. *See, e.g., Fenton,* 796 F.2d at 608. Rather, promises or threats are to be considered with other factors in determining whether a defendant's will has been overborne. See generally, *Albrecht,* 184 Wis. 2d 287; *Walton,* 10 F.3d 1024; *Veilleux,* 846 F. Supp. 149.

¶ 99. In this case, we must determine whether Knapp's will was overwhelmed in light of the totality of the circumstances. *Bryant v. Vose,* 785 F.2d 364, 367–68 (1st Cir. 1986) (quoting *Procunier v. Atchley,* 400 U.S. 446 (1971), *cert. denied,* 477 U.S. 907 (1986) ("A custodial statement is involuntary, if 'the will of the defendant ha[s] been overborne so that the statement [is] not his free and voluntary act . . . in light of the totality of the circumstances.' ")).

¶ 100. The U.S. Supreme Court has stated that an examination of "voluntariness" is one of constitutional due process, and must take into consideration "the totality of . . . the . . . circumstances—both the characteristics of the accused and the details of the interrogation." *Dickerson,* 530 U.S. at 434 (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973)). All the circumstances surrounding the inculpatory statement must be taken into account. *See Malinski v. New York,* 324 U.S.

401, 404 (1945).[21] The ultimate determination of voluntariness depends upon a balancing test between the circumstances of police pressure against the power of resistance of the person confessing. *See Stein v. New York,* 346 U.S. 156, 185 (1953).

¶ 101. Wisconsin has adopted the totality of the circumstances test when evaluating the voluntary nature of self-incriminatory statements. *Clappes,* 136 Wis. 2d at 236–37 (When determining voluntariness, courts examine the totality of the circumstances surrounding the statement, weighing the defendant's personal characteristics against the pressures police imposed upon the defendant to induce a response to the questioning.).

¶ 102. To further clarify the totality of the circumstances test, this court has expressly laid out the applicable factors a court must balance when determining the voluntariness of inculpatory statements:

> The relevant personal characteristics of the confessor include his age, his education and intelligence, his physical and emotional condition, and his prior experience with the police. These factors must be balanced against the police pressures and tactics which have been used to induce the admission, such as the length of the interrogation, any delay in arraignment, the general conditions under which the confessions took place, any excessive physical or psychological pressure . . . any inducements, threats, methods or strategies utilized by the police to compel a response, and whether the individual was informed of his right to counsel and right against self-incrimination.

---

[21] *Malinski v. New York,* 324 U.S. 401, 404 (1945) ("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant.").

*Id. See also Albrecht,* 184 Wis. 2d 287.[22]

¶ 103. In review of the circuit court's application of the factors highlighted in *Albrecht,* we are satisfied that its careful and complete analysis of the attendant facts surrounding the interrogation show, by a clear preponderance of the evidence, that Knapp's statements to DCI agents of November 10, 1998, were indeed voluntary.[23]

■■

¶ 104. The findings of fact made by the circuit court in this case state that the defendant appeared to be of average or above average intelligence (R. 108:16); at the time of the interrogation Knapp had a long and substantial history of interaction with law enforcement (R. 108:17); and he had an "acute awareness" of his rights and ability to control his interactions with law enforcement during interrogations (R. 108:17). Fur-

[22] Additionally, other courts have generally adopted similar factors when determining the voluntariness of inculpatory statements. "Factors to be considered in determining voluntariness include the accused's physical and mental capabilities, the conditions of the interrogation, and the conduct of law enforcement officials." *Veilleux,* 846 F. Supp 149; *see United States v. Browne,* 891 F.2d 389, 393 (1st Cir. 1989); *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir. 1991); *see also Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973) (enumerating factors of voluntariness).

[23] Knapp argues that *State v. Albrecht,* 184 Wis. 2d 287, 516 N.W.2d 776 (Ct. App. 1994), is inapplicable to this case because the defendant in *Albrecht* was not in custody at the time of his confession. The non-custodial interrogation was not subject to protection under *Miranda,* and therefore, is inapplicable to the case at bar. We are not persuaded by this assertion. Ironically, in support of his argument that his statement was involuntary, Knapp cites *Veilleux,* which involved a non-custodial interrogation, and did not involve *Miranda* jurisprudence.

ther, the interrogation between DCI agents and Knapp was short in duration, and did not involve the deprivation of food or drink. (R. 108:17). Due to its short duration, the circuit court found that the interrogators did not engage in relentless questioning aimed at controlling or coercing Knapp's mind. (R. 108:17).

¶ 105. More importantly, the circuit court found, as a matter of fact, that the interrogation did not involve any threats or promises in exchange for cooperation. (R. 108:17). This fact distinguishes this case from many of the cases Knapp offers in support of its position.

¶ 106. As noted, Knapp points to two cases to bolster the argument that the statement was involuntary. In *Walton,* 10 F.3d 1024, an ATF agent investigating the illegal sale of firearms met with the defendant and said, "I've known you for a long time. If you want, you can tell us what happened 'off the cuff.' " *Id.* at 1027. The defendant then proceeded to admit to the agent that he, in fact, sold firearms illegally.

¶ 107. The court in *Walton* had to make a determination as to whether the defendant reasonably believed that the agent's promise that any "off the cuff" statements would not be used against him at a later date. "[T]he appropriate inquiry is whether the defendant reasonably perceived the alleged promise as he asserts." *Id.* at 1029 (quoting *United States v. Shears,* 762 F.2d 397, 402 (4th Cir. 1985)). Based upon the nature of the promise given by the agent, and that he was not advised that he was the suspect in the crime, the court held that the totality of the circumstances suggested that the confession was not voluntary. *Id.* at 1030.

¶ 108. Knapp also relies on *Veilleux* in support of his argument. *Veilleux,* 846 F. Supp. 149. In *Veilleux* the

defendant was arrested and suspected of firing a gun. The gun was not on his person at the time of his arrest. A detective, concerned about the whereabouts of the gun, questioned the defendant about its location. He was not *Mirandized* at the time of questioning. While questioning him the detective said he was not concerned about charging him with a crime, he simply wanted the gun. *Id.* at 152. The defendant said that since he was not going to be charged, he would comply with the questioning. *Id.* Subsequent to the acquisition of the gun, the police charged him with a crime. Based upon the promise made by the detective prior to the defendant's compliance, the court found that the detective misled the defendant and his statements were involuntary and inadmissible. *Id.*

¶ 109. We agree that "promises . . . made by police officers are to be considered along with other circumstances in determining whether a defendant's will has been overborne." *Arizona v. Fulminante,* 499 U.S. 279, 284 (1991); *Jackson,* 918 F.2d at 242. However, evidence showing that a promise has been made by law enforcement officials does not, per se, require a finding that the induced statement was involuntary. *Fenton,* 796 F.2d at 608. In the cases Knapp cites for support, the courts found that the totality of the circumstances (*i.e.,* elicited promises by law enforcement officials) overcame the defendant's will and found that the subsequent confessions were involuntary.

¶ 110. That being said, we need not adhere to the analysis in *Walton* and *Veilleux* because the circuit court found, as a matter of fact, that DCI interrogation did not involve the use of promises in exchange for Knapp's voluntary cooperation. As such, these cases are distinguishable. Based upon the totality of the circum-

stances drawn from the specific facts in this case, we are satisfied that Knapp's statements to DCI agents were indeed voluntary.

A. *Harris* Analysis:

■■■

¶ 111. Furthermore, we hold that the circuit court correctly applied *Harris,* 401 U.S. 222, in ruling that the voluntary statement, obtained without proper *Miranda* warnings, was inadmissible in the State's case-in-chief. However, the circuit court correctly ruled that the voluntary statement was available to the State for the limited purposes of impeachment and rebuttal.

¶ 112. Every criminal defendant has the right to testify in his own defense, or alternatively, refuse to take the stand at trial. However, the right to testify in one's criminal proceedings has never been construed to allow a defendant to commit perjury. *See United States v. Knox,* 396 U.S. 77 (1969).

¶ 113. Indeed, as the court in *Elstad* noted:

> [T]he *Miranda* presumption, though irrebutable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted. Despite the fact that patently *voluntary* statements taken in violation of *Miranda* must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination.

*Elstad,* 470 U.S. at 307.

¶ 114. We hold that the circuit court correctly applied *Harris,* 401 U.S. 222, in ruling that the voluntary statements, obtained without proper *Miranda* warnings, were inadmissible in the State's case-in-chief,

but nonetheless, were available to the State for the limited purposes of impeachment and rebuttal.

## VIII. ISSUE THREE—*EDWARDS* VIOLATION

¶ 115. Knapp asks this court to reverse the ruling of the circuit court, and hold that the physical evidence should be suppressed due to a violation of the rule in *Edwards,* 451 U.S. 477, which provides that custodial interrogation must cease when a suspect unequivocally requests counsel.

¶ 116. Knapp argues that the clothing seized, in particular his sweatshirt, is the inadmissible fruit of an *Edwards* violation, and that the physical evidence obtained through that illegal questioning should be suppressed.

¶ 117. The State disagrees with Knapp's arguments and asks this court to uphold the ruling of the circuit court, which rejected Knapp's argument that the physical evidence should be suppressed for a violation of the rule in *Edwards.*

¶ 118. Since we have determined that the motion to suppress the evidence (the sweatshirt) seized as a direct result of the intentional *Miranda* violation at the apartment should have been granted, there is no need to determine whether the alleged *Edwards* violation should also result in suppression of the sweatshirt seized.

## IX. ISSUE FOUR—KNOCK AND ANNOUNCE

¶ 119. Knapp, arguing that there is another reason for suppression of the sweatshirt, asks this court to reverse the circuit court's ruling that police officers did not have an obligation to knock and announce prior to

entering the dwelling, and that Knapp did not have a reasonable expectation of privacy in the hallway and stairway leading up to the second-floor apartment. Instead, Knapp asks that this court find that the seizure of the sweatshirt flowed directly from an illegal entry, and as such, is tainted fruit, which must be suppressed.

¶ 120. Contrary to Knapp's position, the State asks this court to uphold the circuit court's rejection of Knapp's challenge to the police entry into the apartment stairway. The State argues that the circuit court decision was fair, supported by the evidence, and legally correct.

¶ 121. Since we have determined that the motion to suppress the sweatshirt seized as a direct result of the intentional *Miranda* violation at the apartment should have been granted, there is no need to determine whether the alleged Fourth Amendment violation, relating to a failure to knock and announce at the exterior doors prior to entering the premises, should also result in suppression of the sweatshirt seized.

## X. ISSUE FIVE—SUPPRESSION OF EVIDENCE OBTAINED FROM THE WARRANTLESS SECOND SEARCH

¶ 122. The State asks that the circuit court's order suppressing evidence seized during the second search should be reversed, because the defendant's brother had either actual or apparent authority to consent to the search. Alternatively, if the court holds that the brother did not have valid authority to consent to the search, the State asks that circuit court's order be reversed due to the "inevitable discovery doctrine."

¶ 123. Relying on *United States v. Matlock*, 415 U.S. 164, 171 (1974), the State contends that the

evidence seized during the second search of Knapp's bedroom should not be suppressed because the evidence was obtained during a lawful search conducted with the valid consent of the defendant's brother, the renter-occupant of the apartment.[24]

¶ 124. Moreover, the State argues that *Kieffer,* 217 Wis. 2d 531, is distinguishable from the present case. First, the defendant's bedroom was not in a separate structure. Second, George kept personal property in the bedroom. Third, George had access to the bedroom (the bedroom door had a lock, but apparently there was no key).

¶ 125. Based upon the totality of the circumstances, and upon well-established case law, the State argues that George possessed the authority to consent to a search of the defendant's bedroom.

¶ 126. Finally, the State argues that not only did George have actual authority to consent to the search of the defendant's bedroom, the police acted upon the reasonable belief that George had the power to consent to such a search, and therefore, there was apparent authority for George's consent.

¶ 127. In assessing third-party consent to search, the State contends the critical question is "the sufficiency of the consenting individual's relationship to the premises to be searched . . . ." *Kieffer,* 217 Wis. 2d at 542 (citing *Matlock,* 415 U.S. at 171). Although the circuit court used *Kieffer* in concluding that George had no

---

[24] *United States v. Matlock,* 415 U.S. 164, 171 (1974):

[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.

authority to consent to the search of the guest bedroom, the State argues that *Kieffer* is distinguishable.[25]

¶ 128. Alternatively, the State argues that the evidence seized in the second search should not have been suppressed because it would inevitably have been discovered through use of a search warrant. The State claims that if the court concludes that George did not have proper authority to consent to the search of the

[25] (1) The premises: The premises in this case was within one small two-bedroom apartment.

(2) The nature of the living arrangements: The landlord rented the apartment to George and his wife. No other person was authorized to live there, and the landlord would not have allowed George to sublet or permit Matthew to stay there.

(3) Financial arrangements: There is no evidence that Matthew paid utility bills. Knapp's evidentiary hearing produced no evidence that Matthew paid any rent. There was a verbal agreement that Matthew would pay rent, but never did. George stated, "We basically had an agreement that it would be approximately $150 a month for him to reside with us." (R. 101:19).

(4) Access & Use: The brothers had an understanding— George called it a matter of "common nature" (R. 101:23), perhaps courtesy—that George would ask Matthew before entering the spare bedroom (R. 101:23; R. 104:9–10). But Matthew acknowledged that he shared authority over the room with George. Under *Matlock,* the authority justifying third-party consent to search, "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock,* 415 U.S. at 171 n.7.

(5) Lock: The spare bedroom had a lock, but no key. The spare bedroom was not detached from the house, rather, it was in the apartment.

defendant's bedroom, the seizure of the evidence obtained in that search should nonetheless have been allowed under the "inevitable discovery doctrine." A search tainted by some illegal act may be justified under the doctrine of inevitable discovery.

¶ 129. Knapp disagrees and asks this court to uphold the ruling of the circuit court. Knapp maintains that the circuit court correctly suppressed the evidence seized during the second search of Knapp's bedroom on December 13, 1987, because George did not have actual or apparent authority to consent to the search, and the evidence is not admissible under the doctrine of inevitable discovery. Knapp maintains that the search of his bedroom, following consent by George, was a violation of Knapp's Fourth Amendment rights, because Roets intentionally by-passed Knapp, rendering the consent invalid.

¶ 130. Knapp argues that courts in similar circumstances have held that when police intentionally bypass a suspect who is present and known to have a superior privacy interest in the place to be searched, in order to gain consent to search, the validity of a third-party consent is questionable. *United States v. Impink,* 728 F.2d 1228, 1234 (9th Cir. 1984).[26]

¶ 131. Knapp contends that the search of his bedroom following consent by George was a violation of his Fourth Amendment rights because George did not have actual or apparent authority to consent to the

[26] *Impink* involved the police seeking consent of a landlord before they searched a tenant's property suspected of being a drug lab. The tenant was present at the time of the search and objected. The Ninth Circuit held the landlord's consent invalid. *United States v. Impink,* 728 F.2d 1228, 1234 (9th Cir. 1984).

search of his bedroom.[27] Based on *Kieffer* Knapp maintains that the police must consider the surrounding circumstances, which often requires further inquiry on the part of the officers.

¶ 132. Knapp argues that here the inquiry was non-existent. The circuit court found that Roets simply determined that George and his wife paid rent on the apartment. (R. 107:23; Def. App. 269). There was no further inquiry beyond that point. Knapp argues that the evidence illegally seized from his room at the time of his arrest and during the search upon George's consent is not admissible under the doctrine of inevitable discovery.

¶ 133. To avail itself of the inevitable discovery doctrine under *State v. Schwegler,* 170 Wis. 2d 487, 500, 490 N.W.2d 292 (Ct. App. 1992) (citing *United States v. Cherry,* 759 F.2d 1196, 1204 (5th Cir. 1985), *cert. denied,* 479 U.S. 1056 (1987)), Knapp argues that the State must prove by a preponderance of the evidence that:

> (1) It is reasonably probable that the evidence would have been discovered by lawful means but for the intervening police misconduct;
>
> (2) Before the misconduct occurred, the police already had the leads making the discovery inevitable, and
>
> (3) The police were actively pursuing these leads at the time of the illegality.

¶ 134. The State argues that: "it is readily inferable that if George Knapp had not consented, Detective Roets would have applied for a search warrant, a

---

[27] Knapp states that to rely on the apparent authority of the consenter, the officer must have information at the time of the search that "would justify a reasonable belief that the party consenting to the search had the authority to do so." *State v. Kieffer,* 217 Wis. 2d 531, 548, 577 N.W.2d 352 (1998).

warrant would have been issued, and the evidence in the second search would have been discovered" (Pl.-Appellant Br. at 23). Knapp argues that based upon the State's own admission, it is unreasonable to believe that the police were "actively pursuing leads at the time", enough so to satisfy the third prong of the *Schwegler* test for inevitable discovery.

## XI. ANAYSIS OF ISSUE FIVE

¶ 135. This court employs a two-part test in reviewing an order to suppress evidence. First, as to the circuit court's findings of fact, "this court will uphold the trial court's findings . . . unless they are clearly erroneous." *Harris*, 206 Wis. 2d at 249–50. *See* Wis. Stat. § 805.17(2). Second, issues of constitutional reasonableness are reviewed independently. *Kieffer*, 217 Wis. 2d at 541.

¶ 136. A search of property, conducted without a search warrant and probable cause, is constitutionally valid if based upon proper voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Where consent is relied upon prior to a warrantless search, the State must prove "by clear and positive evidence that the search was the result of a free, intelligent, unequivocal and specific consent without any duress or coercion, actual or implied." *State v. Johnson*, 177 Wis. 2d 224, 233, 501 N.W.2d 876 (Ct. App. 1993). The court must make that determination based upon the totality of the circumstances. *Id.*

¶ 137. Permission to search the premises of a target individual may be obtained from a third party who possesses common authority over the subject pre-

mises. *See Illinois v. Rodriguez,* 497 U.S. 177, 181 (1990); *State v. McGovern,* 77 Wis. 2d 203, 211, 252 N.W.2d 365 (1977). "[O]ne who possesses common authority over premises or effects with another may give valid consent to the authorities to search those premises or effects, even though the other person does not consent." *State v. West,* 185 Wis. 2d 68, 93, 517 N.W.2d 482 (1994).

¶ 138. The determination of "common authority" is not predicated upon a technical application of property law. Rather, practical considerations are more appropriate in this analysis.

> The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock,* 415 U.S. at 171 n.7 (citations omitted).

¶ 139. In this case there is no dispute as to George's ' voluntary consent. He voluntarily consented—in writing and after being advised him of his right to withhold consent (R. 101:33)—to a search of the apartment. (R. 101:35). There is no evidence that the consent was made under coercion or duress. Thus, the only question that remains for us to determine is whether George had authority to consent to a search of Knapp's bedroom.

¶ 140. The State argues that George was legally empowered to consent to a search of the apartment,

335

including Knapp's bedroom, and that he voluntarily consented to the search. In support of that position, the State relies on *State v. Matejka,* 2001 WI 5, 241 Wis. 2d 52, 621 N.W.2d 891 (citing *Matlock,* 415 U.S. at 169–71).

¶ 141. In *Matejka,* the prosecution intended to use evidence obtained from the defendant's jacket during a consensual search of a car in which she was a passenger. *Id.,* ¶ 11. This court held that it was constitutionally reasonable for the police to search and seize the property of a non-consenting passenger when the driver/owner has consented to a search of the car in which the property is found. *Id.,* ¶ 20. This court held as a prerequisite, however, that there be common authority by the two parties over the premises to be searched. *Id.*

¶ 142. The State contends that it is clear from the facts of the case that George had a superior authority over the entire apartment, and at very least, a common authority with the defendant over the bedroom in which the defendant only occasionally stayed.

¶ 143. Knapp disagrees and asks this court to uphold the ruling of the circuit court. Knapp maintains that the circuit court correctly suppressed the evidence seized during the second search of Knapp's bedroom on December 13, 1987, because George did not have actual or apparent authority to consent to the search.

¶ 144. The circuit court found as a matter of fact that Knapp paid rent. Therefore, Knapp argues that this case is similar to *Kieffer,* 217 Wis. 2d 531. In *Kieffer,* the circuit court found that Kieffer and his wife, unlike the defendant, paid no rent but did help pay utility bills on occasion. *Id.*

¶ 145. Based upon these facts, the *Kieffer* court stated: "This testimony is indicative of a respect for the expectations of privacy held by the defendant and his

wife, and not a mere 'habit' of the property owner." *Kieffer,* 217 Wis. 2d at 546. The testimony in *Kieffer* allowed that court to distinguish it from *United States v. Duran,* 957 F.2d 499 (7th Cir. 1992).

¶ 146. Contrary to the State's position that Knapp's residency was loose and transitory, the circuit court found that " . . . the defendant lived there." (R. 107:22; Def. App. 268). The testimony established a clear expectation of privacy on the part of Knapp in the bedroom:

(1) Knapp had his own key to the apartment. (R. 101:24; Def. App. 324).

(2) He was given that bedroom because it had a door with a lock and was the most private bedroom. (R. 101:21, 30; Def. App. 321, 327).

(3) Knapp kept the door closed when he was not home and left it open occasionally when present. (R. 11:30–31; Def. App. 327–28).

(4) Knapp brought with him a television, personal papers, clothing and effects, a dresser, and "pretty much everything" he owned. (R. 101:22–23, 29; Def. App. 322–23, 329; R. 104:9; Def. App. 412).

(5) George testified that he would have no need to enter the room to retrieve hunting rifles because during the time Knapp lived there hunting season was over. (R. 101:31; Def. App. 328).

(6) The circuit court found that the presence of the guns in the room was "simple continued storage of items in [Knapp's] bedroom." (R. 107:22; Def. App. 268).

(7) George and Knapp had an understanding that George would not go into that room without asking Knapp first. (R. 101:23, 32; Def. App. 323, 329; R. 104:10; Def. App. 413).

(8) Knapp moved there specifically because he wanted more privacy than he could expect at his parents' house. (R. 104:154; Def. App. 424).

(9) George tried to respect Knapp's privacy as much as possible. (R. 101:23; Def. App. 323).

(10) George would not have entered the room even to retrieve his belongings while Knapp was not home. (R. 107:22; Def. App. 268).

Based upon the facts above, there was no "mutual use" of the bedroom or "joint access for most purposes" as required by *Matlock,* 415 U.S. 164.

¶ 147. We agree with Knapp's assertion that George did not have actual authority to consent to a search of Knapp's bedroom. Knapp and George did not have "mutual use for most purposes." *Matlock,* 415 U.S. at 172. For Knapp the room was his place of residence; for George it was, at most, a place where he and his wife incidentally continued to store some hunting equipment and other personal property.

¶ 148. In reaching that conclusion, we note that this case is substantially similar to *Kieffer* in that Knapp's expectation of privacy in the bedroom was superior to George's, thus obviating George's authority to consent to the search.

¶ 149. Additionally, Knapp's plans to continue to reside at George's apartment and pay rent for his use of the bedroom were sufficiently open-ended to establish that he was a permanent resident. This sufficiently distinguished this case from *State v. Fountain,* 534 N.W.2d 859 (S.D. 1995), and *United States v. Buckles,* 495 F.2d 1377 (8th Cir. 1974), both of which were about

overnight guests. The argument that Knapp had only been staying in the bedroom for about two weeks is also not persuasive. One's constitutionally guaranteed rights do not attach only after some specified length of time, but rather attach once one establishes a right to privacy that reasonable people are willing to recognize. *See Katz v. United States,* 389 U.S. 347, 361 (1967) (Harlan, J. concurring); *West,* 185 Wis. 2d at 89 (citing *State v. Dixon,* 177 Wis. 2d 461, 467, 501 N.W.2d 442 (1993)).

¶ 150. The State's reliance on *Matejka* does not persuade us to admit the evidence seized during the second search. First, the facts of *Matejka* are distinguishable. *Matejka* involved a jacket left in the passenger compartment of a car, not a separate room within the living quarters. Second, the court in *Matejka* still required common authority over the premises. *Matejka,* 241 Wis. 2d 52, ¶ 20. We have already determined that common authority did not exist in this case.

¶ 151. As for the State's alternate claim that if George did not have actual authority to consent, he had apparent authority to do so, we agree. When the police execute a search based on consent from someone they reasonably believe to have the authority to consent, the search may be held valid and the evidence thereby derived may be admitted. *See Rodriguez,* 497 U.S. at 188–89. The "determination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the moment . . . "warrant a man of reasonable caution in the belief" ' that the consenting party had authority over the premises?" *Id.* at 188–89 (citing *Terry v. Ohio,* 392 U.S. 1, 21–22 (1968)). When insufficient information exists for police to make a determination as to the consenting party's

authority, they are to inquire further until they can establish the presence or lack of authority. *See Kieffer,* 217 Wis. 2d at 550–51. The officers in *Kieffer* made no such inquiries, and the court thus held their reliance on the third party's consent unreasonable, even though the consenting party owned the premises. *Id.*

¶ 152. In this case the police officers that obtained the consent and conducted the second search acted upon a reasonable belief that George and Knapp had at least common authority over the room, and they proceeded with the consensual search on the basis of the consent given by George. Here the officers determined that George and his fiancée were the persons who rented the apartment from the landlord, and they paid the rent. They certainly had access to the bedroom since they kept personal property there, including two hunting rifles, two shotguns, a couch, a bed, and a dresser. The record seems somewhat unclear as to whether the officers learned all of this information before, during, or after the consent search. George expounded further about the personal property in his testimony at a hearing on the motion to suppress:

Q. So in the approximate two years that you were staying there, you were living there before the Defendant came to stay with you, what was the second bedroom used for?

A. Storage

Q. Of—

A. Of—

Q. —what sort—?

A. Of extra clothes, my hunting, fishing stuff. You know, just items like that.

Q. Was it also the guest room then; say, when your daughter came to visit, that's where she would stay?

A. Yes. And then that's exactly where my daughter would stay, yes.

Q. And the, the bed that's shown in the pictures there, —

A. (Reviewing photograph.) Mm—hmm.

Q. —that was the bed that was in the room?

A. Yes.

Q. And that was yours or Helen's?

A. That was Helen's.

Q. As well as the dresser?

A. The white—the white dresser was.

¶ 153. Prior to giving his written consent George had come to the police department voluntarily. Roets testified that he told George of the nature of the investigation involving Knapp, and he told George that he was interested in looking into his trash cans or areas of his apartment where Knapp may have placed clothing. He also testified that he knew Knapp stayed at the apartment, but didn't know for certain the length of time that Knapp had been staying there. George testified that Knapp had been staying there for a couple of weeks at the time of his arrest. George also testified that Roets explained to him that he didn't have to consent to a search of the apartment, and that he was given the opportunity to confer with Knapp before signing the consent form. Nevertheless, George consented to the officers' search of the entire premises.

During his testimony regarding his signing of the consent form George stated the following:

Q. And Detective Roets went over this with you before you signed it, correct?

A. Yes. He said he wanted to search my house.

Q. And you agreed to let him?

A. To search the house, yes.

Q. And you read through this before you signed it, right?

A. Correct.

Q. And you read that you agreed to consent to a search of the —

A. There was the — "to take any letters, papers materials or other property which they may desire."

Q. From, from the premises at South Fifth Street?

A. From my house, yes.

Q. And that includes the room Matt was staying in, correct?

A. There was no conversation about specifically searching that room, no.

Q. Well—

A. He said, the house.

Q. Well—

A. And when we walked in the front door, he went directly to Matt's bedroom.

Q. When he said "the house," you didn't say, "Yes, but not Matt's bedroom," did you?

342

A. No, I did not.

Q. And your house included Matt's bedroom; did it not?

A. Correct.

Q. And this form doesn't say anything about "the premises except the bedroom where the Defendant was staying,"—

A. Right.

It seems quite clear that George did not limit his consent to search in any way. From the time George orally agreed to the search, to the time he talked with Knapp and then met with Detective Roets once again to sign the consent form, George never constricted his consent, and he permitted the officers to search his entire home.

¶ 154. Moreover, once the officers were in his residence, George escorted them to Matt's room, as is evidenced by his testimony. George testified:

Q. And you took them right into Matt's bedroom, and said, "This is his room," didn't you?

A. I showed them where the room was at, yes.

Q. It would be fair to say, Mr. Knapp, that that was yours—yours and Helen's house, correct?

A. Correct.

Q. You were, you were the keepers of that—

A. Correct.

Q. —residence?

Thus, it appeared to the officers that George was in control of the premises and could make decisions whether or not to allow the police to search his residence.

¶ 155. Under the essential facts of this case, which appear to be undisputed, and applying the objective standard set forth in *Rodriguez,* 497 U.S. at 181, we hold that an officer "of reasonable caution" could reasonably conclude that George apparently had authority over the entire apartment. We are satisfied that the State met its burden of proof in that regard. The majority in *Rodriguez* stated:

> The Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape.

*Rodriguez,* 497 U.S. at 186 (citation omitted). Here, of course, the person who consented was a resident, and it was reasonable to conclude that he had full authority to consent to the search. To sum up, at the time of the search of the apartment, George was paying the rent for "my house," and he and his fiancée were keeping several items of their personal property in the bedroom Knapp was using. Before signing the consent form, George was told of the nature of the search, he had the opportunity to confer with Knapp, and he made no attempt to limit the scope of the search by the officers. George and Helen were the "keepers of that residence." That is enough to establish apparent authority under the *Rodriguez* objective standard.

¶ 156. In the alternative, the State argues that the evidence found during the second search should be admitted under the inevitable discovery doctrine. Since we have held that there was apparent authority to consent, there is no need to address this argument.

## XII. ISSUE SIX—ADMISSION OF HEARSAY EVIDENCE

¶ 157. Knapp filed a motion under *State v. Denny,* 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984), to admit evidence of other potential suspects including the victim's husband, Brunner. Knapp sought permission to introduce the evidence of Maas's conduct, and the observation of Brunner's truck at Maas's residence through the testimony of Farrell. Farrell was a close friend of Borchardt who described his personal observations "right after the homicide." Borchardt cannot personally testify because he is deceased, and he was not interviewed prior to his death.

¶ 158. The circuit court ruled the statement by Borchardt to Farrell regarding his observations of Maas's behavior admissible, but the court excluded Borchardt's statement that Maas mumbled something about getting rid of some clothing. (R. 92:6; Def. App. 108–09).

¶ 159. The State argues that the circuit court erred in admitting the testimony regarding Borchardt's personal observations of Maas because:

(1) it does not qualify as "other suspect" evidence under Denny;

(2) it was not admissible as a statement of recent perception; and

(3) the court erred in relying on Chambers because it is not "critical evidence" as contemplated in Chambers.

*Chambers v. Mississippi,* 410 U.S. 284 (1973).

¶ 160. The State maintains that the circuit court erred in ruling that item 21(a) of Knapp's Offer of Proof—an unreliable hearsay statement with no genu-

ine tendency to prove that the victim's husband may have committed the murder—would be admitted at trial. Moreover, the State contends that the circuit court erred in its application of *Denny,* 120 Wis. 2d 614, in that, the challenged evidence did not constitute "third party suspect" evidence. The *Denny* standard indicates that such evidence is admissible only if it creates "a 'legitimate tendency' that the third person could have committed the crime." *Id.* at 623.

¶ 161. The State argues that even if Knapp can show that Brunner had a motive to kill his wife, and that he had a general opportunity to do so, the fact that he and Maas stopped by the Borchardt house on the night of the crime does not create a direct connection to his wife's murder.

¶ 162. The State argues that the offered evidence is inadmissible under Wisconsin's Rules of Evidence. The circuit court concluded that Borchardt's statement to Farrell on his observations of Maas were only "arguably" admissible as a statement of recent perception under Wis. Stat. § Rule 908.045(2). Defense counsel acknowledged that they lacked definiteness and certainty as to when Borchardt made his statement. (R. 110:65.)

¶ 163. Next, the State argues that the circuit court erred in its application of and reliance upon *Chambers. Chambers,* 410 U.S. at 302. *Chambers* held that a mechanistic application of the law of hearsay should not defeat a defendant's right to obtain a fair trial through the presentation of reliable hearsay evidence. *Id.* The evidence relating Borchardt's observation of Brunner's truck is hardly the type of evidence contemplated in *Chambers.*

¶ 164. Knapp disagrees with the State's arguments and asks that this court uphold the ruling of the

circuit court that allowed Knapp to present hearsay testimony set forth in item 21(a) of Knapp's Offer of Proof implicating a third party in the homicide.

¶ 165. The State argues that the evidence in this case does not satisfy the *Denny* standard. Under *Denny,* evidence that a third party had the motive to commit the crime is admissible if it can be demonstrated that there was a "legitimate tendency" that the other suspect may have committed the crime.

¶ 166. The State concedes that motive and opportunity have been established. Third party "connection" to the crime is at issue. Knapp contends that the evidence at issue connects Brunner and Maas to the crime in a number of ways:

(1) The evidence puts Brunner in Watertown in relative proximity to the homicide at the time of the murder.

(2) It also establishes that he lied to investigators about his whereabouts at the time of the murder.

(3) Maas was with Brunner at the time his wife was murdered, and Maas was observed a short time after Resa's murder carrying a paper bag and getting into Brunner's waiting truck.

¶ 167. Knapp argues that the circuit court appropriately looked first at all the evidence to determine whether it sufficiently established Brunner's motive, opportunity, and connection to the crime. The circuit court then analyzed each of the offers of proof to determine the evidentiary basis for admissibility. The circuit court applied the proper legal standard and appropriately exercised its discretion in admitting this evidence under *Denny.*

¶ 168. Next, Knapp argues that the evidence is admissible as a statement of recent perception. As noted before, the State argues that even if the evidence

347

is admissible under *Denny,* the court erred in ruling it was an admissible statement of recent perception pursuant to Wis. Stat. § 908.045(2) because the evidence was unreliable and lacked sufficient detail as to the exact time Borchardt made the statement to Farrell. The State concedes that there is no evidence to indicate that Farrell was untruthful. (R. 110:76; Def. App. 315). However, Knapp contends that the reliability of Farrell's testimony is heightened by corroborating evidence: (1) other independent witnesses place Brunner at the scene of the homicide at the exact time the murder was committed; and (2) other times, when according to his alibi, he was supposed to be miles away.

¶ 169. Knapp states that the lack of specificity as to when Borchardt made his statement is a product of the State's failure to interview Borchardt before his death, and the State had ample opportunity to do so. Knapp points out that the circuit court found that the lack of specificity was due to the failure to interview Borchardt and the conscious decision of the police not to prosecute Knapp until 12 years had passed and critical witnesses had died.

¶ 170. The circuit court held that the police should not profit from its own blunders. (R. 110:75–76; Def. App. 314–15). In *State v. Stevens,* 171 Wis. 2d 106, 119, 490 N.W.2d 753 (Ct. App. 1992), the temporal relationship between an event and a statement describing the event is not as critical when dealing with a statement of recent perception as it is with other hearsay exceptions, such as a statement of present sense impression. The fact that the circuit court denied the double-hearsay statement, Knapp argues, goes to show that the court carefully considered and correctly exercised its discretion.

¶ 171. Knapp argues that the evidence is critical to the defense and subject to *Chambers*.[28] The right to present a defense is grounded in the confrontation and compulsory process clauses of the Sixth Amendment to the U.S. Constitution and Article I, Section 7, of the Wisconsin Constitution. *See Chambers*, 410 U.S. at 302; *State v. Pulizzano*, 155 Wis. 2d 633, 645, 456 N.W.2d 325 (1990). A defendant's right to present a defense may in some cases require the admission of testimony that would otherwise be excluded under applicable evidentiary rules. *See Chambers*, 410 U.S. at 294, 302; *Pulizzano*, 155 Wis. 2d at 648. *See also State v. Jackson*, 216 Wis. 2d 646, 663, 575 N.W.2d 475 (1998). The right to present a defense is not absolute, but rather is limited to the presentation of relevant evidence whose probative value is not substantially outweighed by its prejudicial effect. *See Pulizzano*, 155 Wis. 2d at 646.

¶ 172. The State argues that this evidence is hardly the type contemplated by *Chambers*. (Pl.-Appellant Br. at 34). *Chambers* did not limit its rule only to evidence labeled "critical," instead it stated: "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302. Thus, Knapp's constitutional right to present a defense includes the right to demonstrate Brunner and Maas were seen in Watertown at the time of the murder, and that Maas was actually seen trying to get rid of clothing she had been wearing. This evidence directly affects the determination of guilt in this case.

---

[28] This is the constitutional claim that must be decided de novo.

## XIII. ANALYSIS OF ISSUE SIX

■■■■

¶ 173. Regarding the standard of review for admissible hearsay evidence, "Questions concerning the relevance of particular evidence are to be determined by the trial court's exercise of discretion." *Denny,* 120 Wis. 2d at 625. "This court will not find an abuse of discretion if there is a reasonable basis for the trial court's determination." *Id.* (citing *State v. Pharr,* 115 Wis. 2d at 342). However, like the previous issues, when the focus of a circuit court's ruling is on a defendant's asserted due process right to introduce evidence, the issue is more properly characterized as one of constitutional fact, and is, therefore, subject to de novo review. *See Stutesman,* 221 Wis. 2d at 182.

¶ 174. The State offers three distinct arguments showing that the circuit erred in admitting Maas's hearsay testimony regarding Borchardt's personal observations:

(1) it does not qualify as "other suspect" evidence under the *Denny* standard;

(2) it was not admissible as a statement of recent perception under Wis. Stat. § 908.045(2); and

(3) the court erred in relying on *Chambers* because it is not "critical evidence" as contemplated in the holding of that case.

## A. The *Denny* Analysis:

¶ 175. In *Denny* the defendant argued that he was denied his constitutional right to present a defense when the trial court refused to allow evidence suggesting that a third party had motive and opportunity to commit the crime for which he was accused. *Denny,* 120 Wis. 2d at 625.

350

¶ 176. Defendants have the constitutional right to present witnesses in their defense, however, that evidence must be relevant to the issues before the court. *Milenkovic v. State,* 86 Wis. 2d 272, 286, 272 N.W.2d 320 (Ct. App. 1978). Pursuant to Wis. Stat. § 904.01, relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *See also* Wis. Stat. § 904.02; *Pharr,* 115 Wis. 2d at 342. In other words, this state recognizes the admission of testimony if it tends to prove or disprove a material fact. *Denny,* 120 Wis. 2d at 623. In the case before us Knapp wants to offer the testimony of Maas and Farrell to show that a third party (Brunner) had motive and opportunity to commit the murder for which Knapp is charged. Therefore, Knapp claims the offered testimony is relevant.

¶ 177. The general rule, adopted by this court, concerning the issue is that evidence tending to prove motive and opportunity to commit a crime regarding a party other than the defendant can be excluded when there is no direct connection between the third party and the alleged crime. *Id.* at 622.

¶ 178. The *Denny* court adopted the "legitimate tendency" test gleaned from an early U.S. Supreme Court decision of *Alexander v. United States,* 138 U.S. 353 (1891). The "legitimate tendency" test asks this court to determine whether the evidence offered is so remote in time, place, or circumstance that a direct connection cannot be made between the third party and the crime itself. *Alexander,* 138 U.S. at 356–57. How-

351

ever, to show "legitimate tendency" a defendant is not required to prove the guilt of a third party beyond a reasonable doubt in order to have such evidence admitted in his defense. *Denny*, 120 Wis. 2d at 623. Conversely, "evidence that simply affords a possible ground of suspicion against another person should not be admissible" either. *Id.*

■■■■

¶ 179. In summary, *Denny* expressly states that "as long as motive and opportunity have been shown and as long as there is also some evidence to directly connect a third person to the crime charged which is not remote in time, place, or circumstances, the evidence should be admissible." *Id.*

¶ 180. The State concedes that motive and opportunity regarding Brunner are not at issue in this case. Therefore, this court must determine whether the testimony of Maas and Farrell presents evidence showing a "direct connection" between Brunner and the murder with which Knapp is charged.

¶ 181. *Denny* offers an illustration to exemplify what type of evidence could show a "direct connection" to a degree of certainty required by the legitimate tendency test. "By illustration, where it is shown that a third person not only had the motive and opportunity to commit the crime but also was placed in such proximity to the crime as to show he may have been the guilty party, the evidence is admissible." *Id.* at 624. *See Perry v. Watts,* 520 F. Supp. 550, 557 (N.D. Cal. 1981), *aff'd sub nom, Perry v. Rushen,* 713 F.2d 1447 (9th Cir. 1983).

■■■■

¶ 182. The evidence at issue in this case connects Brunner and Maas to the crime in a number of ways: (1) It establishes that Brunner lied to investi-

gators about his whereabouts at the time of the murder; (2) Maas was with Brunner at the time his wife was murdered, and Maas was observed a short time after Mrs. Brunner's death carrying a paper bag and getting into Brunner's waiting truck; and (3) most importantly, the evidence puts Brunner in Watertown in relative *proximity* to the location where the homicide occurred and near the time of the murder.

¶ 183. Based upon that information, we hold that the circuit court correctly determined that the evidence established Brunner's motive, opportunity and connection to the crime. Further, we hold that the circuit court applied the proper legal standard and appropriately exercised its discretion in admitting this evidence under *Denny*.

B. Admissibility Under Wis. Stat. § 908.045(2)—
 Statement of Recent Perception:

¶ 184. We find no clear error in the circuit court's determination that the third-party hearsay evidence in item 21(a) of Knapp's offer of proof comes within the recent perception exception under Wis. Stat. § 908.045(2),[29] to the hearsay rule. Farrell's inability to recall, 12 years after the fact, exactly when Borchardt made the statements to her does not undermine the

---

[29] Wisconsin Stat. § 908.045(2) provides:

Hearsay exceptions; declarant unavailable. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(2) Statement of recent perception. A statement, not in response to the instigation of a person engaged in investigating, litigating, or settling a claim, which narrates, describes, or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated

requirements of the exception. The focus should be on the circumstances when the statement was originally made.[30] Further, the lack of clarity as to timing is almost certainly due to the failure to prosecute this case earlier.

## C. *Chambers* Analysis:

¶ 185. As stated earlier, when the focus of a circuit court's ruling is on a defendant's asserted due process right to introduce evidence, the issue is oftentimes characterized as one of constitutional fact, and is, therefore, subject to de novo review. *See Stutesman*, 221 Wis.2d at 182 ("[W]hether a trial court's ruling excluding evidence deprived a defendant of the constitutional right to present evidence is a question of 'constitutional fact,' which we review de novo.").

---

litigation in which the declarant was interested, and while the declarant's recollection was clear.

[30] *Wisconsin Rules Of Evidence Handbook, Special Release* (1974) provides:

> Judicial Council Committee's Note. Sub. (2). This subsection is a major change in Wisconsin law which presently would characterize the statement as inadmissible hearsay. Note that this provision and all other provisions in this section are conditioned upon the unavailability of the declarant and contain limitations as assurances of accuracy not contained in the comparable provisions of the Model Code or Uniform Rules.

> Federal Advisory Committee's Note. *Exception (2)*. The rule finds support in several directions. . . . the rule excludes statements made at the instigation of a person engaged in investigating, litigating, or setting a claim. It also incorporates as safeguards the good faith and clarity of recollection required by the Uniform Rule and the exclusion of a statement by a person interested in the litigation provided by the English act.

¶ 186. The right of due process to an accused in a criminal trial is, in essence, the right to the opportunity to defend oneself from the accusations initiated by the State. *Chambers,* 410 U.S. at 294.[31] The right to present a defense originates from the confrontation and compulsory process clause of the Sixth Amendment to the United States Constitution, and applies to the citizens of this state through Article I, Section 7 of the Wisconsin Constitution. *See Chambers,* 410 U.S. at 302; *Pulizzano,* 155 Wis. 2d at 645.

¶ 187. A defendant's right to present a defense may in some cases require the admission of testimony that would otherwise be excluded under applicable evidentiary rules. *Id. See Jackson,* 216 Wis. 2d at 663. The right to present a defense is not absolute, but rather is limited to the presentation of relevant evidence whose probative value is not substantially outweighed by its prejudicial effect. *See Pulizzano,* 155 Wis. 2d at 646.

¶ 188. This court is presented with the question of whether the hearsay evidence presented in this case, which may be excluded by traditional Wisconsin Rules of Evidence, is nonetheless admissible under the protections afforded to citizens through the United States and Wisconsin Constitutions.

---

[31] A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel.

*In re Oliver,* 333 U.S. 257, 273 (1948).

¶ 189. *Chambers* states that:

> The hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact. Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury.

*Chambers,* 410 U.S. at 298 (citing *California v. Green,* 399 U.S. 149, 158 (1970)).

¶ 190. However, the Court in *Chambers* went on to say that "exceptions tailored to allow the introduction of [hearsay] evidence which in fact is likely to be trustworthy have long existed." *Chambers,* 410 U.S. at 302. The Court held that the evidence in question: (1) qualified for the exception to the hearsay rule as a trustworthy statement against interest; and (2) was critical to Chambers' defense. *Id.* As a result, its exclusion implicated "constitutional rights directly affecting the ascertainment of guilt" and the hearsay rule thus could not be "applied mechanistically to defeat the ends of justice." *Id.*

¶ 191. In the present case we have already held that the evidence in question qualifies for admission under the statutory exception to the hearsay rule of Wis. Stat. § 908.045(2) because it is sufficiently clear, given the passage of time, to be trustworthy. We now hold that the evidence is also critical to Knapp's defense.

¶ 192. We hold the evidence is critical because it satisfies the third prong of the *Denny* test for admission of third-party evidence. *Denny,* 120 Wis. 2d at 624. Without it, much of the evidence Knapp offers as to the likelihood of Brunner's involvement in Resa's death may be inadmissible under *Denny,* because the direct link, in time and proximity, between Brunner and Resa's murder will be absent.

¶ 193. Because the evidence in question here qualifies for admission under an exception to the hearsay rule, and is critical to the defense, it implicates "constitutional rights directly affecting the ascertainment of guilt" and should be admitted under *Chambers. Chambers,* 410 U.S. at 302.

## XIV. CONCLUSION

¶ 194. Based upon the holding in *Dickerson,* we reverse the decision of the circuit court denying the motion to suppress evidence obtained as the direct result of a *Miranda* violation arising from the search conducted at the time of Knapp's arrest.

¶ 195. Moreover, we are convinced that Knapp provided statements to the DCI agents voluntarily, and the circuit court correctly applied *Harris* by admitting such statements solely for impeachment purposes during cross-examination.

¶ 196. Since we have determined that the motion to suppress the evidence (the sweatshirt) seized as a direct result of the intentional Miranda violation at the apartment should have been granted, there is no need to determine whether the alleged *Edwards* violation should also result in the suppression of the evidence (the sweatshirt) seized.

¶ 197. Similarly, with regard to the fourth issue, since we have determined that the motion to suppress the evidence (the sweatshirt) seized as a direct result of the intentional *Miranda* violation at the apartment should have been granted, there is no need to determine whether the alleged Fourth Amendment violation, relating to a failure to knock and announce at the exterior doors, prior to entering the premises should also result in suppression of the evidence (the sweatshirt) seized.

¶ 198. Furthermore, based upon the facts of this case, we find that George did have apparent authority to consent to a search of Knapp's bedroom and the circuit court incorrectly suppressed physical evidence obtained during the second warrantless search.

¶ 199. Finally, in light of *Denny, Chambers,* and the rules of evidence, we hold that the circuit court correctly granted a motion to admit hearsay evidence implicating a potential third-party in the victim's murder.

*By the Court.*—The judgment of the circuit court is affirmed in part, reversed in part, and the cause is remanded.

¶ 200. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring in part, dissenting in part).* I join the majority opinion except in two respects: First, I disagree with the majority's conclusion that the physical evidence confiscated by police during the second search of Knapp's bedroom was admissible because Knapp's brother, George, consented to the search of Knapp's bedroom.[1] I agree with the majority opinion that George did not have actual authority to consent to the

[1] *See* majority op., parts X & XI, ¶¶ 122–156.

search of Knapp's bedroom.[2] I disagree, however, with the majority opinion that based on the facts known to the officers at the moment of the search George had apparent authority to consent to the search.[3]

¶ 201. I conclude that the State did not prove by clear and convincing evidence that the officers were reasonable in their belief that George had apparent authority to consent to the search of Knapp's bedroom. Moreover, the physical evidence seized by the police during their illicit search is not admissible under the doctrine of inevitable discovery. Accordingly, I conclude that the physical evidence seized was inadmissible.

¶ 202. Second, I conclude that the majority opinion errs when it holds that Farrell's testimony regarding Borchardt's personal observations was admissible under the hearsay exception for statements of recent perception. There is no evidence that the statements meet the foundational requirement of recent perception.

I

¶ 203. The majority opinion correctly states the legal test for determining whether an officer may rely on an individual's consent to a search:

> [D]etermination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises? If not, then

---

[2] Majority op., ¶ 147.

[3] Majority op., ¶ 151.

warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid."[4]

The burden is on the State to prove by clear and convincing evidence that the officers were reasonable in their belief.[5]

¶ 204. The record is clear. The *only* facts the officers knew "at the moment" they searched Knapp's bedroom were that George paid the rent for the apartment; that Knapp stayed at the apartment; that Knapp had his own bedroom in which he kept his possessions, including his clothing; and that George was cooperating with the police. This is not enough information for an officer to believe that George had authority over Knapp's bedroom.

¶ 205. The officers have an obligation to ask questions to clarify the power of the individual giving consent. Yet the officers made no inquiry of George at all. They did not even ask whether Knapp paid any rent to George. The information available at the moment of the search is readily apparent from the officer's testimony at a hearing on the motion to suppress:

> Q. [counsel] You, at the time that you met with [George] in the office there to discuss this issue [of consenting to the search], never asked him about his agreement with Matthew Knapp as to Matt's living there or renting a room from [George] correct?
>
> A. [officer] Correct.

---

[4] Majority op., ¶ 151 (quoting *Illinois v. Rodriguez,* 497 U.S. 177, 188–89 (1990) (citing *Terry v. Ohio,* 392 U.S. 1, 21–22 (1968))).

[5] *State v. Kieffer,* 217 Wis. 2d 531, 549–50, 577 N.W.2d 352 (1998).

The officer further testified about what he knew and about what questions he asked before he entered Knapp's bedroom. The testimony again clearly shows the officer knew just the facts I have set forth:

Q. [counsel] Okay. You then went back to the office and filled out the Consent to Search form with George, right?

A. [officer] Yes, sir.

Q. And again, there is nothing in your report that you indicate you asked him any questions about his relationship with Matt relative to his using that room or living in that room, right?

A. Right.

Q. In fact, the only information that you indicated in your report relative to any of the circumstances surrounding George Knapp's living arrangement in that apartment is that you indicate, once you're in the apartment during the course of the search with George, that you were informed that he lived there with his fiance [sic], right?

A. That George did?

Q. Correct.

A. Yes, sir.

Q. You never attempted to question George or ask him about whether he felt comfortable on his own entering Matthew Knapp's room in the apartment, right?

A. No. I don't recall any conversations like that.

Q. Whether or not he felt that he had the authority to go into that room to retrieve something, right, never questioned him on anything like that?

361

A. No, sir.

Q. You never questioned him about how long Matthew Knapp had lived there, right?

A. No, not that I recall.

Q. How long he anticipated Matthew Knapp living there?

A. That's correct.

Q. Never questioned him about any lease or arrangement that he had with his landlord?

A. No. I was aware of the fact that he [George] was in control of the apartment and was paying the rent at the apartment. I didn't ask him specifics about the length of his monthly lease or an annual lease, no. But I knew he was in control in paying the rent.

Q. How did you know he was in control of the apartment?

A. I asked him if he was paying the rent at the apartment.

Q. When did you ask him that?

A. At the police station.

Q. Again, that's not something noted anywhere. This is something you remember now?

A. He is the one that I approached to get the Consent to Search.

Q. I appreciate that. Other than the question regarding rent, you had no other discussion with him regarding Matthew Knapp's living in that apartment?

A. Right.

362

¶ 206. This case is very similar to and is governed by *State v. Kieffer,* 217 Wis. 2d 531, 577 N.W.2d 352 (1998), in which the court held for the defendant. The record is clear that the officers did not have sufficient facts to determine George's authority to consent to the search and did not make sufficient inquiry to gather more facts. The State did not prove by clear and convincing evidence that the officers were reasonable in their belief that George had apparent authority to consent to the search of Knapp's bedroom.

¶ 207. The majority opinion obviously struggles to base its holding on the meager facts known to the officers "at the moment" they embarked on the search. The majority opinion asserts that "[t]he record seems somewhat unclear as to whether the officers learned all of this information before, during, or after the consent search"[6] and then uses this opening to rely on facts not known to the officer "at the moment" of the search. The majority opinion states that George "certainly had access to the bedroom" since he and his fiancée "kept personal property there, including two hunting rifles, two shotguns, a couch, a bed, and a dresser."[7]

¶ 208. The record is clear, however, that these facts about George's personal property were not known to the officers "at the moment" of the search and are therefore not relevant to any apparent authority analysis. The officers learned the facts about George's personal property upon which the majority opinion relies only after they entered Knapps's bedroom. An officer so testified:

[6] Majority op., ¶ 152.
[7] *Id.*

Q. [counsel] The — when you were searching in the bedroom, did you notice any guns or hunting equipment?

A. [officer] Yes.

Q. Camping kind of things?

A. Yes.

Q. Do you recall there being any discussion between you and George Knapp about whose items those were?

A. Yes.

Q. And did you have — did you ask him or did he volunteer, or don't you remember?

A. I believed he volunteered. I'm not absolutely certain.

Q. What did he say about whose guns and hunting gear that was?

A. He told me that they were — that was his equipment, and the guns were his.

George's testimony corroborated the officer's:

Q. [counsel] Well, didn't you stand there as they were in the bedroom and make a comment regarding the hunting equipment and firearms —

A. [George] They come —

Q. —claiming it was yours?

A. They come and asked me whose guns they are, and I said, "Them are all mine."

¶ 209. The majority opinion concludes that George had apparent authority based on the fact that he "was a resident, and it was reasonable to conclude

that he had full authority to consent to the search."[8] Implicit in this argument is that it is reasonable for any resident of a home to consent to a search of every part of that home. This is simply not the law.

¶ 210. "In Wisconsin there is no presumption of common authority to consent to a search when an adult defendant lives with his or her spouse's parents or close relatives."[9] A third party's authority to consent to a search is "not to be implied from the mere property interest a third party has in the property."[10] Rather, authority to consent to a search rests "on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."[11] In the present case, the officers did not know facts that would lead them to reasonably believe that George had "joint access or control for most purposes" over Knapp's bedroom.

¶ 211. Indeed, the facts known to the officers at the moment of the search (and maybe even thereafter) cast considerable doubt on George's joint access or control over Knapp's bedroom or George's authority to consent to the search of the bedroom. The officers knew from their first visit with Knapp that Knapp spent time in the apartment that he shared with George, that Knapp had his own bedroom, and that Knapp kept his

---

[8] Majority op., ¶ 155 (citing *Rodriguez,* 497 U.S. at 186).

[9] *State v. Kieffer,* 217 Wis. 2d 531, 554, 577 N.W.2d 352 (1998).

[10] *United States v. Matlock,* 415 U.S. 164, 172 n.7 (1974).

[11] *Id.*

possessions, including his clothes, in the bedroom. These facts are sufficient to trigger a reasonable officer to question George's access or control over Knapp's bedroom and George's authority to consent to a search of the bedroom.

¶ 212. Moreover, the majority opinion states that evidence of authority to consent can be found in George's consent itself. The majority opinion states, "It seems quite clear that George did not limit his consent to search in any way . . . and he permitted the officers to search his entire home."[12] This statement is irrelevant to our inquiry here. The question is not whether George consented to the search. The question is whether George had the authority to consent. The law is that law enforcement officers cannot take an individual's (here George's) consent to search at "face value" but must consider the surrounding facts.[13] No "surrounding facts" are in this record.

¶ 213. Indeed, even if one agrees (and I do not) with the majority opinion's reading of the record as being unclear about what the officers knew when they entered the bedroom, the inescapable conclusion is that the State did not carry its heavy burden by clear and convincing evidence.

II

¶ 214. Because George did not have actual or apparent authority to consent to a search of Knapp's bedroom, the State argues that the evidence is admissible under the inevitable discovery doctrine. To admit the evidence under this doctrine, the State must prove the following by a preponderance of evidence:

[12] Majority op., ¶ 153.
[13] *Kieffer,* 217 Wis. 2d at 549.

(1) It is reasonably probable that the evidence would have been discovered by lawful means but for the intervening police misconduct;

(2) Before the misconduct occurred, the police already had the leads making the discovery inevitable; and

(3) The police were actively pursuing these leads at the time of the illegality.[14]

¶ 215. It is unnecessary to determine whether the first two prongs can be established in the present case, because the State fails on the third prong. The third prong cannot rest on speculation but must be supported by historical fact. Here, there were no historical facts in the record that the police were pursuing a lead at the time they searched Knapp's bedroom. Testimony that the officers would have obtained a warrant had consent not been given is not enough to satisfy the third prong.

## III

¶ 216. Finally, I also disagree with the majority's conclusion that Farrell's testimony regarding Borchardt's personal observations was admissible under the hearsay exception for statements of recent perception. The concurrence in State v. Weed, 2003 WI 85, 263 Wis. 2d 434, 666 N.W.2d 485 (Bradley, J., concurring), which I joined, discusses the foundation necessary to meet this hearsay exception and emphasizes that the exception is to be narrowly applied. In this case, the majority not only broadly applies the exception, but it also completely ignores a foundational requirement: the event or condition must be recently perceived.

[14] State v. Schwengler, 170 Wis. 2d 487, 500, 490 N.W.2d 292 (Ct. App. 1992) (citing United States v. Cherry, 759 F.2d 1196, 1204 (5th Cir. 1985), cert. denied, 479 U.S. 1056 (1987)).

¶ 217. Here, there is no indication of the amount of time between when Borchardt perceived the event and the time he made the statement to Farrell describing that event. The facts cited by the majority opinion state that "*sometime* after Resa's murder Borchardt told Farrell" what he had seen on the night of the murder.[15]

¶ 218. Accordingly, because the timing of the conversation between Borchardt and Farrell is uncertain, it is impossible to determine if the statement was made recently after the event. I therefore conclude that because Knapp failed to demonstrate that Borchardt's statement describes a recent perception, it was an erroneous exercise of discretion for the circuit court to admit the hearsay testimony under the statement of recent perception exception.

¶ 219. For the reasons set forth, I agree with the circuit court that the physical evidence seized on the second search of the bedroom should be suppressed. I also conclude that Farrell's testimony regarding Borchardt's personal observations was inadmissible hearsay. Accordingly, I dissent.

¶ 220. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

¶ 221. DIANE S. SYKES, J. *(concurring in part, dissenting in part)*. I dissent from the court's resolution of the certified issue, Part V of the majority opinion. The majority concludes that the United States Supreme Court's decision in *Dickerson v. United States,* 530 U.S. 428 (2000), "fundamentally altered" the Court's jurisprudence regarding the applicability of the Fourth

---

[15] Majority op., ¶ 10 (emphasis added).

Amendment "fruit of the poisonous tree" doctrine in the context of Fifth Amendment *Miranda*[1] violations. Majority op., ¶ 66–67.

¶ 222. As the majority notes, the Supreme Court has generally distinguished between Fourth and Fifth Amendment violations for purposes of the "fruits" doctrine of *Wong Sun v. United States,* 371 U.S. 471 (1963). Derivative evidence obtained as a result of a Fourth Amendment violation is generally considered tainted and must be suppressed. *Id.* at 488. However, in the Fifth Amendment context, the Supreme Court has twice refused to extend the Fourth Amendment "fruits" doctrine to derivative evidence obtained as a result of a *Miranda* violation. *Oregon v. Elstad,* 470 U.S. 298 (1985); *Michigan v. Tucker,* 417 U.S. 433 (1974).

¶ 223. This distinction stems from the difference between the constitutional rights sought to be protected:

> But as we explained in *Quarles* and *Tucker,* a procedural *Miranda* violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the "fruits" doctrine. The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits. The exclusionary rule, when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth. Where a Fourth Amendment violation "taints" the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted in evidence. Beyond this, the prosecution must show a

---

[1] *Miranda v. Arizona,* 384 U.S. 436 (1966).

sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation.

The *Miranda* exclusionary rule, however, serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled testimony*. Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*. Thus, in the individual case, *Miranda*'s preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.

*Elstad,* 470 U.S. at 306–07 (second emphasis added, internal citations and quotations omitted).

¶ 224. Thus, while a *Miranda* violation generally requires suppression of the unwarned statement, the twin justifications for suppression—ensuring the trustworthiness of evidence and deterring police misconduct —are less compelling in the case of derivative evidence obtained as a result of a *Miranda* violation. *Id.* at 308.

¶ 225. *Elstad* and *Tucker* were based in part on the status of *Miranda* warnings as a judicially-created "prophylactic" intended to protect the Fifth Amendment privilege against compulsory self-incrimination. *Elstad,* 470 U.S. at 308; *Tucker,* 417 U.S. at 446. In *Dickerson,* the Supreme Court held that *Miranda* established a constitutional rule. *Dickerson,* 530 U.S. at 444.

¶ 226. The Supreme Court reaffirmed *Miranda* in *Dickerson,* and also clarified that "*Miranda* announced a constitutional rule that Congress may not supersede legislatively." *Id. Dickerson* thus put to rest the debate about *Miranda*'s status as a mere judicial "prophylactic" requirement or a full-fledged constitutional rule, but it did not otherwise change the Supreme Court's *Miranda* jurisprudence. *Dickerson* held "that *Miranda* and its progeny in this Court govern the admissibility of statements made during custodial interrogation in both state and federal courts." *Dickerson,* 530 U.S. at 432. There is nothing in *Dickerson* that extends *Miranda*'s application beyond "the admissibility of statements," and the holdings of *Elstad* and *Tucker* remain in place as "progeny" of *Miranda.*

¶ 227. This conclusion is borne out by language in *Dickerson* acknowledging the continuing difference between the application of the "fruits" doctrine in the Fourth and Fifth Amendment contexts:

> The Court of Appeals also noted that in *Oregon v. Elstad,* 470 U.S. 298 (1985), we stated that " '[t]he *Miranda* exclusionary rule . . . serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself.' " 166 F.3d, at 690 (quoting *Elstad, supra,* at 306). Our decision in that case—refusing to apply the traditional "fruits" doctrine developed in Fourth Amendment cases—does not prove that *Miranda* is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment.

*Dickerson,* 530 U.S. at 441. This language undercuts any claim that *Dickerson* effectuated a change in the law regarding the general inapplicability of the "fruits" doctrine to derivative evidence obtained as a result of a

*Miranda* violation. Indeed, this passage signals the Court's intention to stay the course.

¶ 228. The majority notes the split in the federal appellate courts on the implications of *Dickerson* for the "fruits" doctrine in the context of a *Miranda* violation. Majority op., ¶¶ 56–62. Only the Tenth Circuit has held that as a result of *Dickerson,* the "fruits" doctrine now applies to *Miranda* violations. *United States v. Patane,* 304 F.3d 1013 (10th Cir. 2002)(applying "fruits" doctrine to negligent failure to give *Miranda* warnings). The First Circuit has held that the "fruits" doctrine *might* now apply to a *Miranda* violation, depending upon the circumstances, and more particularly, whether the violation was intentional or merely negligent. *United States v. Faulkingham,* 295 F.3d 85 (1st Cir. 2002)(declining to apply "fruits" doctrine to negligent failure to give *Miranda* warnings, but leaving open the question whether it applies to intentional *Miranda* violations).

¶ 229. In contrast, the Third and Fourth Circuits have held that *Dickerson* did not alter the general inapplicability of the "fruits" doctrine to *Miranda* violations. *United States v. DeSumma,* 272 F.3d 176 (3d Cir. 2001)(holding that "fruits" doctrine does not apply to *Miranda* violations); *United States v. Sterling,* 283 F.3d 216 (4th Cir. 2002)(holding that "fruits" doctrine does not apply to *Miranda* violations). The Supreme Court has granted certiorari in *Patane,* 123 S. Ct. 1788, and has not acted on a certiorari petition in *Faulkingham.* The Court denied certiorari in *DeSumma,* 535 U.S. 1028, and *Sterling,* 536 U.S. 931.

¶ 230. *Dickerson* left intact the Supreme Court's long-standing distinction between Fourth and Fifth Amendment violations for purposes of suppression of derivative evidence under the "fruits" doctrine. *Dickerson*'s declaration that *Miranda* announced a con-

stitutional rule does not affect the trustworthiness of physical evidence obtained as a result of a *Miranda* violation, and I am not convinced that the deterrence rationale in this situation is enough on its own to justify suppression. While *Miranda* is a constitutional rule and not a mere judicial "prophylactic," suppression of derivative evidence that flows from a *Miranda* violation does little to deter violations of the underlying constitutional right in question, the right against compulsory self-incrimination.

¶ 231. Accordingly, I conclude that *Dickerson* does not require us to overrule *State v. Yang,* 2000 WI App 63, ¶¶ 32–38, 233 Wis. 2d 545, 608 N.W.2d 703, in which the court of appeals reversed the suppression of a gun that was seized as a result of a *Miranda* violation, citing *Elstad* and *Tucker.* Although *Dickerson*'s clarification of the constitutional status of *Miranda* has some implications for the doctrinal underpinnings of the *Elstad-Tucker* rule, there is nothing in *Dickerson* to indicate that *Elstad* and *Tucker* are no longer good law. As such, we need not overrule *Yang;* and suppression of the sweatshirt as derivative evidence obtained as a result of the *Miranda* violation in this case is not required.

¶ 232. Neither is suppression required as a result of an alleged *Edwards*[2] violation, an issue the majority does not reach as a result of its conclusion on the certified question. *Edwards* requires the police to cease questioning a suspect who clearly invokes the right to counsel during custodial interrogation. *Edwards v. Arizona,* 451 U.S. 477, 484–85 (1981). In *Davis v. United States,* 512 U.S. 452, 459 (1994), the Supreme Court held that the *Edwards* rule does not apply unless the

---

[2] *Edwards v. Arizona,* 451 U.S. 477 (1981).

suspect unambiguously and unequivocally requests counsel. *See also State v. Jennings,* 2002 WI 44, ¶ 29, 252 Wis. 2d 228, 647 N.W.2d 142.

¶ 233. In *Davis,* the Supreme Court concluded that a suspect who says, "Maybe I should talk to a lawyer" has not clearly and unambiguously requested counsel. *Davis,* 512 U.S. at 462. In *Jennings,* we held, consistent with *Davis,* that a suspect who says "I think maybe I need to talk to a lawyer" has not clearly and unambiguously requested counsel. *Jennings,* 252 Wis. 2d 228, ¶ 36. Here, the circuit court concluded that Knapp's statement "I was calling my lawyer in Milwaukee" was not a clear and unambiguous request for counsel under *Davis.* I agree. Knapp's reference to counsel is similar to those at issue in *Davis* and *Jennings.* Because Knapp did not clearly and unambiguously invoke his right to counsel, I would affirm the circuit court's conclusion that there was no *Edwards* violation.

¶ 234. The majority's conclusion on the certified question also means that it need not reach Knapp's claim that the officers had an obligation to "knock and announce" prior to entering the outer stairway to the upstairs apartment that Knapp shared with his brother. On this issue, I would affirm the circuit court's conclusion that the police had no duty to "knock and announce," because Knapp did not have a reasonable expectation of privacy in the staircase leading up to the apartment. *See United States v. Jacobson,* 466 U.S. 109, 113 (1984). The exterior door was unlocked and had no doorbell; the stairway was not used for private purposes and functioned essentially as an exterior entryway to the apartment's actual threshold. I agree with the circuit court that Knapp had no reasonable expectation of privacy in the outer hallway, and therefore the

374

officers were not required to "knock and announce" until they reached the upstairs apartment door. *See, e.g., State v. Edgeberg,* 188 Wis. 2d 339, 524 N.W.2d 911 (Ct. App. 1994) (no reasonable expectation of privacy in an unlocked porch that contained few private possessions).

¶ 235. For the foregoing reasons, I dissent from Part V of the majority opinion, and would instead affirm the circuit court's denial of suppression of the blood-stained sweatshirt. In all other respects, I concur.